# PALMER ET AL. v. THOMPSON, MAYOR OF THE CITY OF JACKSON, ET AL.

No. 107.   Argued December 14, 1970—Decided June 14, 1971

218

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, and BLACKMUN, JJ., joined. BURGER, C. J., *post,* p. 227, and BLACKMUN, J., *post,* p. 228, filed concurring opinions. DOUGLAS, J., filed a dissenting opinion, *post,* p. 231. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 240. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and WHITE, JJ., joined, *post,* p. 271.

*Paul A. Rosen* and *William M. Kunstler* argued the cause for petitioners. With them on the briefs were *Ernest Goodman* and *Arthur Kinoy.*

*William F. Goodman, Jr.,* argued the cause for respondents. On the brief were *John E. Stone, Thomas H. Watkins,* and *Elizabeth W. Grayson.*

Briefs of *amici curiae* urging reversal were filed by *Solicitor General Griswold, Assistant Attorney General Leonard,* and *Deputy Solicitor General Wallace* for the United States, and by *Armand Derfner* for James Moore et al.

MR. JUSTICE BLACK delivered the opinion of the Court

In 1962 the city of Jackson, Mississippi, was maintaining five public parks along with swimming pools, golf links, and other facilities for use by the public on a racially segregated basis. Four of the swimming pools were used by whites only and one by Negroes only. Plaintiffs brought an action in the United States District

Court seeking a declaratory judgment that this state-enforced segregation of the races was a violation of the Thirteenth and Fourteenth Amendments, and asking an injunction to forbid such practices. After hearings the District Court entered a judgment declaring that enforced segregation denied equal protection of the laws but it declined to issue an injunction.[1] The Court of Appeals affirmed, and we denied certiorari.[2] The city proceeded to desegregate its public parks, auditoriums, golf courses, and the city zoo. However, the city council decided not to try to operate the public swimming pools on a desegregated basis. Acting in its legislative capacity, the council surrendered its lease on one pool and closed four which the city owned. A number of Negro citizens of Jackson then filed this suit to force the city to reopen the pools and operate them on a desegregated basis. The District Court found that the closing was justified to preserve peace and order and because the pools could not be operated economically on an integrated basis.[3] It held the city's action did not deny black citizens equal protection of the laws. The Court of Appeals sitting en banc affirmed, six out of 13 judges dissenting.[4] That court rejected the contention that since the pools had been closed either in whole or in part to avoid desegregation the city council's action was a denial of equal protection of the laws. We granted certiorari to decide that question. We affirm.

I

Petitioners rely chiefly on the first section of the Fourteenth Amendment which forbids any State to "deny to any person within its jurisdiction the equal protection

[1] Clark v. Thompson, 206 F. Supp. 539 (SD Miss. 1962).
[2] 313 F. 2d 637 (CA5), cert. denied, 375 U. S. 951 (1963).
[3] The court's opinion is not officially reported.
[4] 419 F. 2d 1222 (CA5 1969).

of the laws." There can be no doubt that a major purpose of this amendment was to safeguard Negroes against discriminatory state laws—state laws that fail to give Negroes protection equal to that afforded white people. History shows that the achievement of equality for Negroes was the urgent purpose not only for passage of the Fourteenth Amendment but for the Thirteenth and Fifteenth Amendments as well. See, e. g., Slaughter-House Cases, 16 Wall. 36, 71–72 (1873). Thus the Equal Protection Clause was principally designed to protect Negroes against discriminatory action by the States. Here there has unquestionably been "state action" because the official local government legislature, the city council, has closed the public swimming pools of Jackson. The question, however, is whether this closing of the pools is state action that denies "the equal protection of the laws" to Negroes. It should be noted first that neither the Fourteenth Amendment nor any Act of Congress purports to impose an affirmative duty on a State to begin to operate or to continue to operate swimming pools. Furthermore, this is not a case where whites are permitted to use public facilities while blacks are denied access. It is not a case where a city is maintaining different sets of facilities for blacks and whites and forcing the races to remain separate in recreational or educational activities.[5] See, e. g., Watson v. City of Memphis, 373 U. S. 526 (1963); Brown v. Board of Education, 347 U. S. 483 (1954).

Unless, therefore, as petitioners urge, certain past cases require us to hold that closing the pools to all denied

[5] My Brother WHITE's dissent suggests that the pool closing operates unequally on white and blacks because, "The action of the city in this case interposes a major deterrent to seeking judicial or executive help in eliminating racial restrictions on the use of public facilities." Post, at 269. It is difficult to see the force of this argument since Jackson has desegregated its public parks, auditoriums, golf courses, city zoo, and the record indicates it now maintains no segregated public facilities.

equal protection to Negroes, we must agree with the courts below and affirm.

## II

Although petitioners cite a number of our previous cases, the only two which even plausibly support their argument are *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218 (1964), and *Reitman* v. *Mulkey,* 387 U. S. 369 (1967). For the reasons that follow, however, neither case leads us to reverse the judgment here.[6]

A. In *Griffin* the public schools of Prince Edward County, Virginia, were closed under authority of state and county law, and so-called "private schools" were set up in their place to avoid a court desegregation order. At the same time, public schools in other counties in Virginia remained open. In Prince Edward County the "private schools" were open to whites only and these schools were in fact run by a practical part-

---

[6] *Bush* v. *Orleans Parish School Board,* 187 F. Supp. 42 (ED La. 1960), aff'd, 365 U. S. 569 (1961), does not lead us to reverse the judgment here. In *Bush* we wrote no opinion but merely affirmed a lower federal court judgment that held unconstitutional certain laws designed to perpetuate segregation in the Louisiana public schools. One law held unconstitutional by the lower court empowered the State Governor to close any school ordered to integrate; another empowered him to close all state schools if one were integrated. Of course that case did not involve swimming pools but rather public schools, an enterprise we have described as "perhaps the most important function of state and local governments." *Brown* v. *Board of Education, supra,* at 493. More important, the laws struck down in *Bush* were part of an elaborate package of legislation through which Louisiana sought to maintain public education on a segregated basis, not to end public education. See also *Bush* v. *Orleans Parish School Board,* 188 F. Supp. 916 (ED La. 1960). Of course there was no serious problem of probing the motives of a legislature in *Bush* because most of the Louisiana statutes explicitly stated they were designed to forestall integrated schools. 187 F. Supp., at 45.

nership between State and county, designed to preserve segregated education. We pointed out in *Griffin* the many facets of state involvement in the running of the "private schools." The State General Assembly had made available grants of $150 per child to make the program possible. This was supplemented by a county grant program of $100 per child and county property tax credits for citizens contributing to the "private schools." Under those circumstances we held that the closing of public schools in just one county while the State helped finance "private schools" was a scheme to perpetuate segregation in education which constituted a denial of equal protection of the laws. Thus the *Griffin* case simply treated the school program for what it was—an operation of Prince Edward County schools under a thinly disguised "private" school system actually planned and carried out by the State and the county to maintain segregated education with public funds. That case can give no comfort to petitioners here. This record supports no intimation that Jackson has not completely and finally ceased running swimming pools for all time. Unlike Prince Edward County, Jackson has not pretended to close public pools only to run them under a "private" label. It is true that the Leavell Woods pool, previously leased by the city from the YMCA, is now run by that organization and appears to be open only to whites. And according to oral argument, another pool owned by the city before 1963 is now owned and operated by Jackson State College, a predominantly black institution, for college students and their guests.[7] But unlike the "private schools" in Prince Edward County there is nothing here to show the city is directly or indirectly involved in the funding or operation of either pool.[8] If the time ever

---

[7] Tr. of Oral Arg. 31–32.

[8] There is no question before us here whether the black citizens of Jackson may be entitled to utilize the swimming facilities of Leavell

comes when Jackson attempts to run segregated public pools either directly or indirectly, or participates in a subterfuge whereby pools are nominally run by "private parties" but actually by the city, relief will be available in the federal courts.

B. Petitioners also claim that Jackson's closing of the public pools authorizes or encourages private pool owners to discriminate on account of race and that such "encouragement" is prohibited by *Reitman* v. *Mulkey, supra.*

In *Reitman,* California had repealed two laws relating to racial discrimination in the sale of housing by passing a constitutional amendment establishing the right of private persons to discriminate on racial grounds in real estate transactions. This Court there accepted what it designated as the holding of the Supreme Court of California, namely that the constitutional amendment was an official authorization of racial discrimination which significantly involved the State in the discriminatory acts of private parties. 387 U. S., at 376–378, 380–381.

In the first place there are no findings here about any state "encouragement" of discrimination, and it is not clear that any such theory was ever considered by the District Court. The implication of petitioners' argument appears to be that the fact the city turned over to the YMCA a pool it had previously leased is sufficient to show automatically that the city has conspired with the YMCA to deprive Negroes of the opportunity to swim in integrated pools. Possibly in a case where the city and the YMCA were both parties, a court could find that the city engaged in a subterfuge, and that liability could be fastened on it as an active participant

Woods pool. Nothing on the present record indicates state involvement in the running of that pool. The YMCA, which apparently now operates the pool, was not joined as a party and thus, of course, no judgment could be entered against it.

in a conspiracy with the YMCA. We need not speculate upon such a possibility, for there is no such finding here, and it does not appear from this record that there was evidence to support such a finding. *Reitman* v. *Mulkey* was based on a theory that the evidence was sufficient to show the State was abetting a refusal to rent apartments on racial grounds. On this record, *Reitman* offers no more support to petitioners than does *Griffin*.

## III

Petitioners have also argued that respondents' action violates the Equal Protection Clause because the decision to close the pools was motivated by a desire to avoid integration of the races. But no case in this Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it. The pitfalls of such analysis were set forth clearly in the landmark opinion of Mr. Chief Justice Marshall in *Fletcher* v. *Peck*, 6 Cranch 87, 130 (1810), where the Court declined to set aside the Georgia Legislature's sale of lands on the theory that its members were corruptly motivated in passing the bill.

A similar contention that illicit motivation should lead to a finding of unconstitutionality was advanced in *United States* v. *O'Brien*, 391 U. S. 367, 383 (1968), where this Court rejected the argument that a defendant could not be punished for burning his draft card because Congress had allegedly passed the statute to stifle dissent. That opinion explained well the hazards of declaring a law unconstitutional because of the motivations of its sponsors. First, it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment. *Id.*, at 383, 384. Here, for example, petitioners have argued that the Jackson pools were closed because of ideological opposition to racial integration in swim-

ming pools. Some evidence in the record appears to support this argument. On the other hand the courts below found that the pools were closed because the city council felt they could not be operated safely and economically on an integrated basis. There is substantial evidence in the record to support this conclusion. It is difficult or impossible for any court to determine the "sole" or "dominant" motivation behind the choices of a group of legislators. Furthermore, there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters. If the law is struck down for this reason, rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons.

It is true there is language in some of our cases interpreting the Fourteenth and Fifteenth Amendments which may suggest that the motive or purpose behind a law is relevant to its constitutionality. *Griffin* v. *County School Board, supra; Gomillion* v. *Lightfoot,* 364 U. S. 339, 347 (1960). But the focus in those cases was on the actual effect of the enactments, not upon the motivation which led the States to behave as they did. In *Griffin,* as discussed *supra,* the State was in fact perpetuating a segregated public school system by financing segregated "private" academies. And in *Gomillion* the Alabama Legislature's gerrymander of the boundaries of Tuskegee excluded virtually all Negroes from voting in town elections. Here the record indicates only that Jackson once ran segregated public swimming pools and that no public pools are now maintained by the city. Moreover, there is no evidence in this record to show that the city is now covertly aiding the maintenance and operation of pools which are private in name only. It shows no state action affecting blacks differently from whites.

Petitioners have argued strenuously that a city's possible motivations to ensure safety and save money cannot validate an otherwise impermissible state action. This proposition is, of course, true. Citizens may not be compelled to forgo their constitutional rights because officials fear public hostility or desire to save money. *Buchanan v. Warley,* 245 U. S. 60 (1917); *Cooper v. Aaron,* 358 U. S. 1 (1958); *Watson v. City of Memphis,* 373 U. S. 526 (1963). But the issue here is whether black citizens in Jackson *are* being denied their constitutional rights when the city has closed the public pools to black and white alike. Nothing in the history or the language of the Fourteenth Amendment nor in any of our prior cases persuades us that the closing of the Jackson swimming pools to all its citizens constitutes a denial of "the equal protection of the laws."

## IV

Finally, some faint and unpersuasive argument has been made by petitioners that the closing of the pools violated the Thirteenth Amendment which freed the Negroes from slavery. The argument runs this way: The first Mr. Justice Harlan's dissent in *Plessy v. Ferguson,* 163 U. S. 537, 552 (1896), argued strongly that the purpose of the Thirteenth Amendment was not only to outlaw slavery but also all of its "badges and incidents." This broad reading of the amendment was affirmed in *Jones v. Alfred H. Mayer Co.,* 392 U. S. 409 (1968). The denial of the right of Negroes to swim in pools with white people is said to be a "badge or incident" of slavery. Consequently, the argument seems to run, this Court should declare that the city's closing of the pools to keep the two races from swimming together violates the Thirteenth Amendment. To reach that result from the Thirteenth Amendment would severely stretch its short simple words and do violence to its history. Establish-

ing this Court's authority under the Thirteenth Amendment to declare new laws to govern the thousands of towns and cities of the country would grant it a law-making power far beyond the imagination of the amendment's authors. Finally, although the Thirteenth Amendment is a skimpy collection of words to allow this Court to legislate new laws to control the operation of swimming pools throughout the length and breadth of this Nation, the Amendment does contain other words that we held in *Jones* v. *Alfred H. Mayer Co.* could empower Congress to outlaw "badges of slavery." The last sentence of the Amendment reads:

"Congress shall have power to enforce this article by appropriate legislation."

But Congress has passed no law under this power to regulate a city's opening or closing of swimming pools or other recreational facilities.

It has not been so many years since it was first deemed proper and lawful for cities to tax their citizens to build and operate swimming pools for the public. Probably few persons, prior to this case, would have imagined that cities could be forced by five lifetime judges to construct or refurbish swimming pools which they choose not to operate for any reason, sound or unsound. Should citizens of Jackson or any other city be able to establish in court that public, tax-supported swimming pools are being denied to one group because of color and supplied to another, they will be entitled to relief. But that is not the case here.

The judgment is

*Affirmed.*

MR. CHIEF JUSTICE BURGER, concurring.

I join the opinion of MR. JUSTICE BLACK, but add a brief comment.

The elimination of any needed or useful public ac-

commodation or service is surely undesirable and this is particularly so of public recreational facilities. Unfortunately the growing burdens and shrinking revenues of municipal and state governments may lead to more and more curtailment of desirable services. Inevitably every such constriction will affect some groups or segments of the community more than others. To find an equal protection issue in every closing of public swimming pools, tennis courts, or golf courses would distort beyond reason the meaning of that important constitutional guarantee. To hold, as petitioners would have us do, that every public facility or service, once opened, constitutionally "locks in" the public sponsor so that it may not be dropped (see the footnote to MR. JUSTICE BLACKMUN's concurring opinion), would plainly discourage the expansion and enlargement of needed services in the long run.

We are, of course, not dealing with the wisdom or desirability of public swimming pools; we are asked to hold on a very meager record that the Constitution *requires* that public swimming pools, once opened, may not be closed. But all that is good is not commanded by the Constitution and all that is bad is not forbidden by it. We would do a grave disservice, both to elected officials and to the public, were we to require that every decision of local governments to terminate a desirable service be subjected to a microscopic scrutiny for forbidden motives rendering the decision unconstitutional.

MR. JUSTICE BLACKMUN, concurring.

I, too, join MR. JUSTICE BLACK's opinion and the judgment of the Court.

Cases such as this are "hard" cases for there is much to be said on each side. In isolation this litigation may

not be of great importance; however, it may have sig- nificant implications.

The dissent of MR. JUSTICE WHITE rests on a convic- tion that the closing of the Jackson pools was racially motivated, at least in part, and that municipal action so motivated is not to be tolerated. That dissent builds to its conclusion with a detailed review of the city's and the State's official attitudes of past years.

MR. JUSTICE BLACK's opinion stresses, on the other hand, the facially equal effect upon all citizens of the decision to discontinue the pools. It also emphasizes the difficulty and undesirability of resting any constitutional decision upon what is claimed to be legislative motivation.

I remain impressed with the following factors: (1) No other municipal recreational facility in the city of Jack- son has been discontinued. Indeed, every other service— parks, auditoriums, golf courses, zoo—that once was seg- regated, has been continued and operates on a nonsegre- gated basis. One must concede that this was effectuated initially under pressure of the 1962 declaratory judgment of the federal court. (2) The pools are not part of the city's educational system. They are a general municipal service of the nice-to-have but not essential variety, and they are a service, perhaps a luxury, not enjoyed by many communities. (3) The pools had operated at a deficit. It was the judgment of the city officials that these deficits would increase. (4) I cannot read into the closing of the pools an official expression of inferiority toward black citizens, as MR. JUSTICE WHITE and those who join him repetitively assert, *post*, at 240–241, 266, and 268, and certainly on this record I cannot perceive this to be a "fact" or anything other than speculation. Further- more, the alleged deterrent to relief, said to exist because of the risk of losing other public facilities, *post*, at 269,

is not detectable here in the face of the continued and desegregated presence of all other recreational facilities provided by the city of Jackson.   (5) The response of petitioners' counsel at oral argument to my inquiry* whether the city was to be "locked in" with its pools for an indefinite time in the future, despite financial loss of whatever amount; just because at one time the pools of Jackson had been segregated, is disturbing.

There are, of course, opposing considerations enumerated in the two dissenting opinions.   As my Brothers BLACK, DOUGLAS, and WHITE all point out, however, the Court's past cases do not precisely control this one, and the present case, if reversed, would take us farther than any before.   On balance, in the light of the factors I have listed above, my judgment is that this is neither the time nor the occasion to be punitive toward Jackson for its past constitutional sins of segregation.   On the record as presented to us in this case, I therefore vote to affirm.

---

*"Q. Mr. Rosen, if you were to prevail here, would the city or Jackson be locked in to operating the pools irrespective of the economic consequences of that operation?

"A. If the question is forever. If it was purely an economic problem, having nothing to do with race, or opposition to integration, they could handle that problem the way any community handles that problem, if it is purely an economic decision.   But if it becomes a consideration of race, which creates the economic difficulties, then it seems to me that this Court in numerous decisions has answered that question.   It answered it in *Watson,* it answered it in *Brown,* and it answered it in *Green.*

"Q. Well, this is in the premise of my question, for you to prevail here, this racial overtone, I will assume, you must concede must be present.   Now suppose you prevail, and suppose they lose economically year after year by increasing amounts.   My question is, are they locked in forever?

"A. If the question is, are they locked in forever because of racial problems which cause a rise in economic difficulties in operating the pool, my answer is that they would be locked in." Tr. of Oral Arg. 43–44.

MR. JUSTICE DOUGLAS, dissenting.

Jackson, Mississippi, closed all the swimming pools owned and operated by it, following a judgment of the Court of Appeals in *Clark* v. *Thompson,* 313 F. 2d 637, which affirmed the District Court's grant of a declaratory judgment that three Negroes were entitled to the desegregated use of the city's swimming pools. 206 F. Supp. 539. No municipal swimming facilities have been opened to any citizen of either race since that time; and the city apparently does not intend to reopen the pools on an integrated basis.

That program is not, however, permissible if it denies rights created or protected by the Constitution. *Buchanan* v. *Warley,* 245 U. S. 60, 81. I think that the plan has that constitutional defect; and that is the burden of this dissent.

*Hunter* v. *Erickson,* 393 U. S. 385, *Reitman* v. *Mulkey,* 387 U. S. 369, and *Griffin* v. *County School Board,* 377 U. S. 218, do not precisely control the present case. They are different because there state action perpetuated ongoing regimes of racial discrimination in which the State was implicated.

In *Griffin,* the State closed public schools in one county only, not in the others, and meanwhile contributed to the support of private segregated white schools. 377 U. S., at 232. That, of course, was a continuation of segregation in another form. In *Hunter* a city passed a housing law which provided that before an ordinance regulating the sale or lease of realty on the basis of race could become effective it had to be approved by a majority vote. Thus the protection of minority interests became much more difficult.[1] We held that a state agency

---

[1] *James* v. *Valtierra,* 402 U. S. 137, undertook to distinguish *Hunter* on the ground that the California referendum on low-rent housing which submitted the issue to majority vote was "neutral on

could not in its voting scheme so disadvantage Negro interests. In *Reitman* the State repealed legislation prohibiting racial discrimination in housing, thus encouraging racial discrimination in the housing market. 387 U. S., at 376.

Whether, in the closing of all municipal swimming pools in Jackson, Mississippi, any artifices and devices were employed as in *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, to make the appearance not conform to the reality, is not shown by this record. Under *Burton*, if the State has a continuing connection with a swimming pool, it becomes a public facility and the State is under obligation to see that the operators meet all Fourteenth Amendment responsibilities. 365 U. S., at 725. We may not reverse under *Burton* because we do not know what the relevant facts are.

Closer in point is *Bush* v. *Orleans Parish School Board*, 187 F. Supp. 42, aff'd, 365 U. S. 569. Louisiana, as part of her strategy to avoid a desegregated public school system, authorized the Governor to close any public school ordered to be integrated. The three-judge District Court relying on *Cooper* v. *Aaron*, 358 U. S. 1, 17, held that the Act was unconstitutional and enjoined the Governor from enforcing it. The District Court decision was so clearly correct that we wrote no opinion when we affirmed the three-judge court. While there were other Louisiana laws also held unconstitutional as perpetuating a state segregated school system, the one giving the Governor the right to close any public school ordered integrated seems indistinguishable from this one.

---

its face" and not "aimed at a racial minority." The regime of *Hunter*, therefore, remains undisturbed. Yet there was no answer to the claim that a referendum solely for housing for the poor violates the Equal Protection Clause. However that may be, in the instant case the target was not the poor, but a racial minority.

May a State in order to avoid integration of the races abolish all of its public schools? That would dedicate the State to backwardness, ignorance, and existence in a new Dark Age. Yet is there anything in the Constitution that says that a State must have a public school system? Could a federal court enjoin the dismantling of a public school system? Could a federal court order a city to levy the taxes necessary to construct a public school system? Such supervision over municipal affairs by federal courts would be a vast undertaking, conceivably encompassing schools, parks, playgrounds, civic auditoriums, tennis courts, athletic fields, as well as swimming pools.

My conclusion is that the Ninth Amendment has a bearing on the present problem. It provides:

"The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

Rights, not explicitly mentioned in the Constitution, have at times been deemed so elementary to our way of life that they have been labeled as basic rights. Such is the right to travel from State to State. *United States* v. *Guest,* 383 U. S. 745, 758. Such is also the right to marry. *Loving* v. *Virginia,* 388 U. S. 1, 12. The "rights" retained by the people within the meaning of the Ninth Amendment may be related to those "rights" which are enumerated in the Constitution. Thus the Fourth Amendment speaks of the "right of the people to be secure in their persons, houses, papers, and effects" and protects it by well-known procedural devices. But we have held that that enumerated "right" also has other facets commonly summarized in the concept of privacy. *Griswold* v. *Connecticut,* 381 U. S. 479.

There is, of course, not a word in the Constitution, unlike many modern constitutions, concerning the right of

the people to education or to work or to recreation by swimming or otherwise. Those rights, like the right to pure air and pure water, may well be rights "retained by the people" under the Ninth Amendment. May the people vote them down as well as up?

A State may not, of course, interfere with interstate commerce; and to the extent that public services are rendered by interstate agencies the State by reason of the Supremacy Clause is powerless to escape. The right to vote is a civil right guaranteed by the Constitution as we recently re-emphasized in *Oregon* v. *Mitchell,* 400 U. S. 112. In *Anderson* v. *Martin,* 375 U. S. 399, the State required designation on the ballots of every candidate's race. We said:

> "In the abstract, Louisiana imposes no restriction upon anyone's candidacy nor upon an elector's choice in the casting of his ballot. But by placing a racial label on a candidate at the most crucial stage in the electoral process—the instant before the vote is cast—the State furnishes a vehicle by which racial prejudice may be so aroused as to operate against one group because of race and for another. This is true because by directing the citizen's attention to the single consideration of race or color, the State indicates that a candidate's race or color is an important—perhaps paramount—consideration in the citizen's choice, which may decisively influence the citizen to cast his ballot along racial lines." 375 U. S., at 402.

A constitutional right cannot be so burdened. We stated in *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 638, that: "One's right to life, liberty, and property . . . and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." And we added in *Lucas* v. *Colorado General Assembly,* 377 U. S. 713, 736–737, "A citi-

zen's constitutional rights can hardly be infringed simply because a majority of the people choose that [they] be." Thus the right of privacy, which we honored in *Griswold*, may not be overturned by a majority vote at the polls, short of a constitutional amendment.

In determining what municipal services may not be abolished the Court of Appeals drew the line between "an essential public function" and other public functions. Whether state constitutions draw that line is not our concern. Certainly there are no federal constitutional provisions which make that distinction.

Closing of the pools probably works a greater hardship on the poor than on the rich; and it may work greater hardship on poor Negroes than on poor whites, a matter on which we have no light. Closing of the pools was at least in part racially motivated. And, as stated by the dissenters in the Court of Appeals:

> "The closing of the City's pools has done more than deprive a few thousand Negroes of the pleasures of swimming. It has taught Jackson's Negroes a lesson: In Jackson the price of protest is high. Negroes there now know that they risk losing even segregated public facilities if they dare to protest segregation. Negroes will now think twice before protesting segregated public parks, segregated public libraries, or other segregated facilities. They must first decide whether they wish to risk living without the facility altogether, and at the same time engendering further animosity from a white community which has lost its public facilities also through the Negroes' attempts to desegregate these facilities.
>
> "The long-range effects are manifold and far-reaching. If the City's pools may be eliminated from the public domain, parks, athletic activities, and libraries also may be closed. No one can say

how many other cities may also close their pools or other public facilities. The City's action tends to separate the races, encourage private discrimination, and raise substantial obstacles for Negroes asserting the rights of national citizenship created by the Wartime Amendments." 419 F. 2d 1222, 1236.

That view has strong footing in our decisions. "The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." *Loving* v. *Virginia,* 388 U. S., at 10. Cf. *McLaughlin* v. *Florida,* 379 U. S. 184, 196. When the effect is "to chill the assertion of constitutional rights by penalizing those who choose to exercise them" (*United States* v. *Jackson,* 390 U. S. 570, 581) that state action is "patently unconstitutional."

While Chief Justice Marshall intimated in *Fletcher* v. *Peck,* 6 Cranch 87, 130, that the motives which dominate or influence legislators in enacting laws are not fit for judicial inquiry, we do look closely at the thrust of a law to determine whether in purpose or effect there was an invasion of constitutional rights. See *Epperson* v. *Arkansas,* 393 U. S. 97, 109; *Griffin* v. *County School Board,* 377 U. S., at 231. A candidate may be defeated because the voters are bigots. A racial issue may inflame a community causing it to vote a humane measure down. The federal judiciary cannot become involved in those kinds of controversies. The question for the federal judiciary is not what the motive was, but what the consequences are.

In *Reitman* an active housing program had been racially dominated and then controlled by a state law ending discrimination. But in time the State reversed its policy and lifted the anti-discrimination controls. Thus it launched or at least tolerated a regime of racially discriminatory housing.

It is earnestly argued that the same result obtains here because the regime of desegregated swimming decreed by the District Court is ended and is supplanted by state-inspired, state-favored private swimming pools by clubs and others which perpetuate segregation.

We are told that the history of this episode shows the "steel-hard, inflexible, undeviating official policy of segregation" in Mississippi. *United States* v. *City of Jackson,* 318 F. 2d 1, 5.

I believe that freedom from discrimination based on race, creed, or color has become by reason of the Thirteenth, Fourteenth, and Fifteenth Amendments one of the "enumerated rights" under the Ninth Amendment that may not be voted up or voted down.

Much has been written concerning the Ninth Amendment including the suggestion that the rights there secured include "rights of natural endowment." [2] B. Patterson, The Forgotten Ninth Amendment 53 (1955).

Mr. Justice Goldberg, concurring in *Griswold* v. *Connecticut, supra,* at 492, said:

> "[T]he Ninth Amendment shows a belief of the Constitution's authors that fundamental rights exist that are not expressly enumerated in the first eight amendments and an intent that the list of rights included there not be deemed exhaustive." [3]

---

[2] And see Comment, Ninth Amendment Vindication of Unenumerated Fundamental Rights, 42 Temple L. Q. 46, 53–56 (1968); Bertelsman, The Ninth Amendment and Due Process of Law—Toward a Viable Theory of Unenumerated Rights, 37 U. Cin. L. Rev. 777, 787 *et seq.* (1968); Forkosch, Does "Secure the Blessings of Liberty" Mandate Governmental Action?, 1 Ariz. St. L. J. 17, 32 (1970).

[3] "Nor am I turning somersaults with history in arguing that the Ninth Amendment is relevant in a case dealing with a *State's* infringement of a fundamental right. While the Ninth Amendment—and indeed the entire Bill of Rights—originally concerned restrictions

We need not reach that premise in this case. We deal here with analogies to rights secured by the Bill of Rights or by the Constitution itself. Franklin, The Ninth Amendment as Civil Law Method and its Implications for Republican Form of Government, 40 Tul. L. Rev. 487, 490–492 (1966); Redlich, Are There "Certain Rights . . . Retained by the People"?, 37 N. Y. U. L. Rev. 787, 810–812 (1962); Black, The Unfinished Business of the Warren Court, 46 Wash. L. Rev. 3, 37–45 (1970); Kutner, The Neglected Ninth Amendment: The "Other Rights" Retained by the People, 51 Marq. L. Rev. 121, 134–137 (1968).

"The Fourteenth Amendment and the two escorting amendments establish a principle of absolute equality, an equality which is denied by racial separation or segregation because the separation in truth consecrates a hierarchy of racial relations, and hence permits inequality." [4]

The Solicitor General says:

> "[T]o the extent that the municipality had voluntarily undertaken to provide swimming facilities for its citizens, making it unnecessary for the private sector to develop equally adequate facilities, the closing of the pools has insured that racial segregation will be perpetuated."

---

upon *federal* power, the subsequently enacted Fourteenth Amendment prohibits the States as well from abridging fundamental personal liberties. And, the Ninth Amendment, in indicating that not all such liberties are specifically mentioned in the first eight amendments, is surely relevant in showing the existence of other fundamental personal rights, now protected from state, as well as federal, infringement. In sum, the Ninth Amendment simply lends strong support to the view that the 'liberty' protected by the Fifth and Fourteenth Amendments from infringement by the Federal Government or the States is not restricted to rights specifically mentioned in the first eight amendments." 381 U. S., at 493.

[4] Franklin, The Relation of the Fifth, Ninth and Fourteenth Amendments to the Third Constitution, 4 How. L. J. 170, 180 (1958).

Our cases condemn the creation of state laws and regulations which foster racial discrimination—segregated schools, segregated parks, and the like. The present case, to be sure, is only an analogy. The State enacts no law saying that the races may not swim together. Yet it eliminates all its swimming pools so that the races will not have the opportunity to swim together. While racially motivated state action is involved, it is of an entirely negative character. Yet it is in the penumbra[5] of the policies of the Thirteenth, Fourteenth, and Fifteenth Amendments and as a matter of constitutional policy should be in the category of those enumerated rights protected by the Ninth Amendment. If not included, those rights become narrow legalistic concepts which turn on the formalism of laws, not on their spirit.

I conclude that though a State may discontinue any of its municipal services—such as schools, parks, pools, athletic fields, and the like—it may not do so for the purpose of perpetuating or installing *apartheid* or because it finds life in a multi-racial community difficult or unpleasant. If that is its reason, then abolition of a designated public service becomes a device for perpetuating a segregated way of life. That a State may not do.

As MR. JUSTICE BRENNAN said in *Evans* v. *Abney*, 396 U. S. 435, 453 (dissenting), where a State abandoned a park to avoid integration:

"I have no doubt that a public park may constitutionally be closed down because it is too ex-

---

[5] While the Equal Protection Clause protects individuals against state action, "the involvement of the State" need not be "either exclusive or direct." *United States* v. *Guest*, 383 U. S. 745, 755. "In a variety of situations the Court has found state action of a nature sufficient to create rights under the Equal Protection Clause even though the participation of the State was peripheral, or its action was only one of several co-operative forces leading to the constitutional violation." *Id.*, at 755–756.

pensive to run or has become superfluous, or for some other reason, strong or weak, or for no reason at all. But under the Equal Protection Clause a State may not close down a public facility solely to avoid its duty to desegregate that facility."

*Hunter* and *Reitman* went to the verge of that problem. *Bush* went the whole way. We should reaffirm what our summary affirmance of *Bush* plainly implied.

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

I agree with the majority that the central purpose of the Fourteenth Amendment is to protect Negroes from invidious discrimination. Consistent with this view, I had thought official policies forbidding or discouraging joint use of public facilities by Negroes and whites were at war with the Equal Protection Clause. Our cases make it unquestionably clear, as all of us agree, that a city or State may not enforce such a policy by maintaining officially separate facilities for the two races. It is also my view, but apparently not that of the majority, that a State may not have an official stance against desegregating public facilities and implement it by closing those facilities in response to a desegregation order.

Let us assume a city has been maintaining segregated swimming pools and is ordered to desegregate them. Its express response is an official resolution declaring desegregation to be contrary to the city's policy and ordering the facilities closed rather than continued in service on a desegregated basis. To me it is beyond cavil that on such facts the city is adhering to an unconstitutional policy and is implementing it by abandoning the facilities. It will not do in such circumstances to say that whites and Negroes are being treated alike because both are denied use of public services. The fact is that closing the pools is an expression of official policy that Negroes

are unfit to associate with whites. Closing pools to prevent interracial swimming is little different from laws or customs forbidding Negroes and whites from eating together or from cohabiting or intermarrying. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144 (1970); *Loving* v. *Virginia*, 388 U. S. 1 (1967); *McLaughlin* v. *Florida*, 379 U. S. 184 (1964); *Lombard* v. *Louisiana*, 373 U. S. 267 (1963). The Equal Protection Clause is a hollow promise if it does not forbid such official denigrations of the race the Fourteenth Amendment was designed to protect.

The case before us is little, if any, different from case just described. Jackson, Mississippi, closed its swim- ming pools when a district judge struck down the city's tradition of segregation in municipal services and made clear his expectation that public facilities would be integrated. The circumstances surrounding this action and the absence of other credible reasons for the closings leave little doubt that shutting down the pools was nothing more or less than a most effective expression of official policy that Negroes and whites must not be permitted to mingle together when using the services provided by the city.

I am quite unpersuaded by the majority's assertion that it is impermissible to impeach the otherwise valid act of closing municipal swimming pools by resort to evidence of invidious purpose or motive. Congress has long provided civil and criminal remedies for a variety of official and private conduct. In various situations these statutes and our interpretations of them provide that such conduct falls within the federal proscription only upon proof of forbidden racial motive or animus. An otherwise valid refusal to contract the sale of real estate falls within the ban of 42 U. S. C. § 1982 upon proof that the refusal was racially motivated. *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968). A restau-

rant's refusal to serve a white customer is actionable under 42 U. S. C. § 1983 where the evidence shows that refusal occurred because the white was accompanied by Negroes and was pursuant to a state-enforced custom of racial segregation. *Adickes, supra.* Just last week in *Griffin* v. *Breckenridge, ante,* p. 88, we construed 42 U. S. C. § 1985 (3) to reach wholly private conspiracies—in that case to commit assault on Negroes— where sufficient evidence of "racial . . . animus" or "invidiously discriminatory motivation" accompanied the conspirators' actions. *Griffin* v. *Breckenridge, supra,* at 102. In rejecting the argument that § 1985 (3) was subject to an implied state action limitation, we indicated that racially motivated conspiracies or activities would be actionable under § 1983 if done under color of law. *Id.,* at 98–99. Official conduct is no more immune to characterization based on its motivation than is private conduct, and we have so held many times. The police are vulnerable under § 1983 if they subject a person "to false arrest for vagrancy for the purpose of harassing and punishing [him] for attempting to eat with black people," *Adickes, supra,* at 172, or if they "intentionally tolerate violence or threats of violence directed toward those who violated the practice of segregating the races at restaurants." *Ibid.*

In another decision last week, we reversed a three-judge court ruling in a suit under § 1983 that the multi-member apportionment plan there involved operated to minimize or dilute the voting strength of Negroes in an identifiable ghetto area. However, in an opinion joined by four members of the majority in the instant case, we cautioned that:

> "[T]he courts have been vigilant in scrutinizing schemes allegedly conceived or operated as purposeful devices to further racial discrimination. . . . But there is no suggestion here that Marion County's

multi-member district, or similar districts throughout
the State, *were conceived* or operated *as purposeful
devices to further racial* or economic *discrimination."
Whitcomb* v. *Chavis, ante,* p. 124, at 149 (emphasis
added).

Further, motivation analysis has assumed great im-
portance in suits under 42 U. S. C. § 1983 as a result
of this Court's opinions in *Younger* v. *Harris,* 401 U. S.
37 (1971), and its companion cases. There the Court
held that even though a state criminal prosecution was
pending, federal relief would be appropriate on allega-
tions in a complaint to the effect that state officials were
utilizing state criminal statutes in bad faith, with no
hope of obtaining valid convictions under them, in an
effort to harass individuals in the exercise of their con-
stitutional rights. Obviously, in order to determine its
jurisdiction in each such case, a federal court must
examine and make a determination of the same kind
of official motivation which the Court today holds
unreviewable.

In thus pursuing remedies under the federal civil rights
laws, as petitioners are doing under §§ 1981 and 1983 here,
Negro plaintiffs should have every right to prove that
the action of the city officials was motivated by nothing
but racial considerations. In examining their conten-
tions, it will be helpful to re-create the context in which
this case arises.

I

In May 1954, this Court held that "[s]eparate edu-
cational facilities are inherently unequal." *Brown* v.
*Board of Education,* 347 U. S. 483, 495. In a series
of opinions following closely in time, the Court em-
phasized the universality and permanence of the prin-
ciple that segregated public facilities of any kind were
no longer permissible under the Fourteenth Amendment.

*Muir* v. *Louisville Park Theatrical Assn.*, 347 U. S. 971 (1954), decided one week after *Brown*, saw the Court review a decision of the Court of Appeals for the Sixth Circuit which had affirmed a district court order holding that Negro plaintiffs were entitled to the use of public golf courses and a public fishing lake in Iroquois Park in Louisville, but that the privately owned theatrical association that leased a city-owned amphitheater in the same park was not guilty of discrimination proscribed by the Fourteenth Amendment in refusing to admit Negroes to its operatic performances. The Court vacated the judgment and remanded "for consideration in the light of the Segregation Cases decided May 17, 1954 . . . and conditions that now prevail." *Ibid.*[1]

At the beginning of the October 1955 Term, the Court resolved any possible ambiguity about the action taken in *Muir*. In a pair of summary decisions, the Court made it clear that state-sanctioned segregation in the operation of public recreational facilities was prohibited. *Mayor and City Council of Baltimore* v. *Dawson*, 350 U. S. 877 (1955), was a summary affirmance of a decision by the Court of Appeals for the Fourth Circuit that officials of the State and city could not enforce a policy of racial segregation at public beaches and bathhouses. On the same day, the Court confirmed that use of a public golf course could not be denied to any person on account of his race. *Holmes* v. *City of Atlanta*, 350 U. S. 879 (1955).

The lower federal courts played a very important role in this ongoing process. For example, in June 1956,

---

[1] See *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961) (segregated restaurant operated under lease in municipal facility).

a three-judge district court in Alabama, relying on *Brown, Dawson,* and *Holmes,* held that:

> "[T]he statutes and ordinances requiring segregation of the white and colored races on the motor buses of a common carrier of passengers in the City of Montgomery and its police jurisdiction violate the due process and equal protection of the law clauses of the Fourteenth Amendment . . . ."

*Browder* v. *Gayle,* 142 F. Supp. 707, 717 (MD Ala.). Again this Court affirmed summarily, citing *Brown, Dawson,* and *Holmes.* 352 U. S. 903 (1956). Some public officials remained unconvinced. In early 1958, the Court of Appeals for the Fifth Circuit summarily rejected as without merit an appeal by the New Orleans City Park Improvement Association from a summary judgment including a permanent injunction prohibiting the Association, a municipal corporation, from denying Negroes the use of the facilities of the New Orleans City Park. *New Orleans City Park Improvement Assn.* v. *Detiege,* 252 F. 2d 122 (CA5 1958). When the Association took a further appeal to this Court, the judgment was affirmed in a one-line opinion. *New Orleans City Park Improvement Assn.* v. *Detiege,* 358 U. S. 54 (1958). Other decisions in this Court and the lower federal courts demonstrated the pervasive idea that officially segregated public facilities were *not* equal.[2]

---

[2] See, *e. g., Boynton* v. *Virginia,* 364 U. S. 454 (1960) (application of Interstate Commerce Act); *Burton, supra,* n. 1; *Turner* v. *City of Memphis,* 369 U. S. 350 (1962) (public restaurant in municipal airport); *Johnson* v. *Virginia,* 373 U. S. 61 (1963) (courtrooms); *Brown* v. *Louisiana,* 383 U. S. 131, 139 (1966) (libraries); *City of St. Petersburg* v. *Alsup,* 238 F. 2d 830 (CA5 1956) (beach and swimming pool); *Department of Conservation & Development* v. *Tate,* 231 F. 2d 615 (CA4), cert. denied, 352 U. S. 838 (1956) (state park); *Willie* v. *Harris County,* 202 F. Supp. 549 (SD Tex. 1962)

Throughout the same period, this Court and other courts rejected attempts by various public bodies to evade their clear duty under *Brown* and its progeny by employing delaying tactics or other artifices short of open defiance. *Cooper* v. *Aaron,* 358 U. S. 1 (1958); *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961); *Watson* v. *City of Memphis,* 373 U. S. 526 (1963); *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218 (1964).[3] Meanwhile, countless class suits seeking desegregation orders were successfully prosecuted by Negro plaintiffs in the lower federal courts. Many public facilities were opened to all citizens, regardless of race, without direct intervention by this Court. Several of these local suits are relevant to the present case.

The city of Jackson was one of many places where the consistent line of decisions following from *Brown* had little or no effect.[4] Public recreational facilities were

---

(county park); *Shuttlesworth* v. *Gaylord,* 202 F. Supp. 59 (ND Ala. 1961), aff'd *sub nom. Hanes* v. *Shuttlesworth,* 310 F. 2d 303 (CA5 1962) (parks, tennis courts, swimming pools, zoo, golf courses, baseball parks, museum, auditorium); *Moorhead* v. *City of Ft. Lauderdale,* 152 F. Supp. 131 (SD Fla.), aff'd, 248 F. 2d 544 (CA5 1957) (golf course); *Ward* v. *City of Miami,* 151 F. Supp. 593 (SD Fla. 1957) (golf course); *Holley* v. *City of Portsmouth,* 150 F. Supp. 6 (ED Va. 1957) (golf course); *Fayson* v. *Beard,* 134 F. Supp. 379 (ED Tex. 1955) (city parks).

[3] See also *Green* v. *County School Board of New Kent County,* 391 U. S. 430 (1968).

[4] See *Thomas* v. *Mississippi,* 380 U. S. 524 (1965); *NAACP* v. *Thompson,* 357 F. 2d 831 (CA5 1966); *Bailey* v. *Patterson,* 199 F. Supp. 595 (SD Miss. 1961), vacated, 369 U. S. 31 (1962); *United States* v. *City of Jackson,* 206 F. Supp. 45 (SD Miss. 1962), rev'd, 318 F. 2d 1, 5–6 (CA5 1963) (common carrier terminals), where the Court of Appeals stated:

"We again take judicial notice that the State of Mississippi has a steel-hard, inflexible, undeviating official policy of segregation. The policy is stated in its laws. It is rooted in custom. The segregation signs at the terminals in Jackson carry out that policy. The Jackson

not desegregated although it had become clear that such action was required by the Constitution. As respondents state in their brief in this case:

"In 1963 the City of Jackson was operating equal but separate recreational facilities such as parks and golf links, including swimming pools. A suit was brought in the Southern District of Mississippi to enjoin the segregated operation of these facilities. The City of Jackson took the position in that litigation that the segregation of recreational facilities, if separate but equal recreational facilities were provided and if citizens voluntarily used segregated facilities, was constitutional." Respondents' Brief 2.

This was nearly nine years after *Brown* and more than seven years after *Dawson* and *Holmes.*

The suit respondents refer to was instituted in 1962 as a class action by three Negro plaintiffs who alleged that some city facilities—parks, libraries, zoo, golf courses, playgrounds, auditoriums, and other recreational complexes—were closed to them because of their race. The defendants were Jackson city officials, including Mayor Allen C. Thompson and Director of Parks and Recreation George Kurts, both respondents in the present case. The plaintiffs in that suit were successful. The District Court's opinion began by stating that Jackson

police add muscle, bone, and sinew to the signs." (Footnotes omitted.)

See also *Singleton* v. *Jackson Municipal Separate School Dist.,* 348 F. 2d 729 (CA5 1965); *Singleton* v. *Jackson Municipal Separate School Dist.,* 355 F. 2d 865 (CA5 1966); *Singleton* v. *Jackson Municipal Separate School Dist.,* 419 F. 2d 1211 (CA5 1969), rev'd in part *sub nom. Carter* v. *West Feliciana Parish School Board,* 396 U. S. 290 (1970); *Singleton* v. *Jackson Municipal Separate School Dist.,* 426 F. 2d 1364 (CA5), *modified,* 430 F. 2d 368 (CA5 1970); *Singleton* v. *Jackson Municipal Separate School Dist.,* 432 F. 2d 927 (CA5 1970).

was a city "noted for its low crime rate and lack of racial friction except for the period in 1961 when the self-styled Freedom Riders made their visits." *Clark* v. *Thompson,* 206 F. Supp. 539, 541 (SD Miss. 1962). It was also stated that Jackson had racially exclusive neighborhoods, that as this residential pattern had developed the city had "duplicated" its recreational facilities in white and Negro areas, and that members of each race "have customarily used the recreational facilities located in close proximity to their homes." *Ibid.* The final finding of fact was that the "defendants are not enforcing separation of the races in public recreational facilities in the City of Jackson. The defendants do encourage voluntary separation of the races." *Ibid.*[5]

Among the District Court's conclusions of law were the following: (1) that the suit was not a proper class action since the Negro plaintiffs had failed to show that their interests were not antagonistic to or incompatible with those of the purported class;[6] (2) that the three original plaintiffs were entitled to an adjudication by declaratory judgment of "their personal claims of right to unsegregated use of public recreational facilities," 206 F. Supp.,

---

[5] In an affidavit filed August 18, 1965, in the District Court in the present case, Mayor Thompson stated, "I believe that the welfare of both races would have best been served if [the custom that members of each race would use the recreational facilities near their homes] had continued."

[6] But see *Brown* v. *Board of Education,* 347 U. S. 483, 495 (1954); *Dawson* v. *Mayor and City Council of Baltimore,* 220 F. 2d 386 (CA4), aff'd, 350 U. S. 877 (1955); *Holmes* v. *City of Atlanta,* 223 F. 2d 93, 94–95 (CA5), rev'd, 350 U. S. 879 (1955); *Browder* v. *Gayle,* 142 F. Supp. 707, 714 (MD Ala.), aff'd, 352 U. S. 903 (1956); *New Orleans City Park Improvement Assn.* v. *Detiege,* 252 F. 2d 122, 123 (CA5), aff'd, 358 U. S. 54 (1958); see also *Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320, 329–330 (1970).

at 542; (3) that injunctive relief was inappropriate as a matter of law;[7] and (4) that

> "The individual defendants in this case are all outstanding, high class gentlemen and in my opinion will not violate the terms of the declaratory judgment issued herein. They know now what the law is and what their obligations are, and I am definitely of the opinion that they will conform to the ruling of this Court without being coerced so to do by an injunction. The City of Jackson, a municipality, of course is operated by some of these high class citizens. I am further of the opinion that during this period of turmoil the time now has arrived when the judiciary should not issue injunctions perfunctorily, but should place trust in men of high character that they will obey the mandate of the Court without an injunction hanging over their heads." 206 F. Supp., at 543.

As the city has stressed in its brief here, it did not appeal from this judgment, which was entered in May 1962. The Negro plaintiffs, however, did appeal, claiming that the relief afforded was inadequate. The Court of Appeals for the Fifth Circuit affirmed *per curiam*, 313 F. 2d 637 (CA5 1963). On December 16, 1963, this Court denied certiorari, 375 U. S. 951.

It must be noted here that none of Jackson's public recreational facilities was desegregated until after the appellate proceedings in *Clark* v. *Thompson* were fully concluded.[8] This was true despite the fact that under this Court's prior decisions the only possible result of such review would have been a broadening of the relief

---

[7] But see cases cited n. 6, *supra*.

[8] See Respondents' Brief 3; Affidavit of Allen C. Thompson, App. 21; Affidavit of George T. Kurts, App. 18.

granted by the District Judge. Moreover, from the time of the trial court's decision in. *Clark* v. *Thompson,* the mayor of Jackson made public statements, of record in this case, indicating his dedication to maintaining segregated facilities. On May 24, 1962, nine days after the District Court's decision in *Clark* v. *Thompson,* the Jackson Daily News quoted Mayor Thompson as saying:

> " 'We will do all right this year at the swimming pools . . . but if these agitators keep up their pressure, we would have five colored swimming pools because we are not going to have any intermingling.' . . . He said the City now has legislative authority to sell the pools or close them down if they can't be sold." App. 15.

A year passed while the appeals in *Clark* v. *Thompson* were pending, but the city's official attitude did not change. On May 24, 1963, the Jackson Daily News reported that "Governor Ross Barnett today commended Mayor Thompson for his pledge to maintain Jackson's present separation of the races." App. 15. On the next day, the same newspaper carried a front page article stating that "Thompson said neither agitators nor President Kennedy will change the determination of Jackson to retain segregation." App. 16.

During May and June 1963, the Negro citizens of Jackson organized to present their grievances to city officials. On May 27, a committee representing the Negro community met with the mayor and two city commissioners. Among the grievances presented was a specific demand that the city desegregate public facilities, including the city-operated parks and swimming pools.

On the day following this meeting, the Jackson Daily News quoted the mayor as saying:

> " 'In spite of the current agitation, the Commissioners and I shall continue to plan and seek money

for ·additional parks for our Negro citizens. To-morrow we are discussing with local Negro citizens plans to immediately begin a new clubhouse and library in the Grove Park area, and other park and recreational facilities for Negroes throughout the City. We cannot proceed, however, on the proposed $100,000 expenditure for a Negro swimming pool in the Grove Park area as long as there is the threat of·racial disturbances.' " App. 15.

On May 30, 1963, the same paper reported· that the mayor had announced that "[p]ublic swimming pools would not.be opened on schedule this year due to some minor water difficulty." App. 5.

The city at this·time operated five swimming facilities on a segregated basis: the Livingston Lake swimming facility, in reality a lake with beach facilities, at Livingston Park; a swimming pool in Battlefield Park; a swimming pool and a wading pool in Riverside Park; a pool that. the city leased from the YMCA in Leavell Woods Park; a swimming pool and a wading pool for Negroes .in College Park.[9] In literature describing its Department of Parks and Recreation, the city stressed that "[o]ur $.10· and $.20 charge for swimming . . . [is] the lowest to be found anywhere in the country. The fees are kept low in order to serve as many people as possible." In one of two affidavits that he filed below, Parks Director Kurts stated that for the years 1960, 1961, and 1962, the average annual expense to the city of operating each of the pools in Battlefield, Riverside, and College Park was $10,000. The average annual revenue from the pools in Battlefield

_____

[9] At the time *Clark* v. *Thompson* was decided, the population of Jackson consisted of approximately 100,000 whites and 50,000 Negroes. Despite this 2:1 ratio in population,·there were four swimming facilities for whites and only one for Negroes.

and Riverside Parks was $8,000 apiece; the average annual revenue from the Negro pool in College Park was $2,300. Thus, for these three facilities, the city was absorbing an annual loss of approximately $11,700; and was doing so "in order to serve as many people as possible."

From the time of the announcement of "minor water difficulty" at the end of May 1963, none of these swimming facilities has operated under public aegis. The city canceled its lease on the Leavell Woods pool, and it has since been operated on a "whites only" basis by its owner, the YMCA, apparently without city involvement.[10] At oral argument, counsel for the city informed us that the pool that was located in the Negro neighborhood—the College Park pool—"was sold by the City to the Y. The YMCA opened it up and the black people boycotted so it wasn't being used, then the YMCA sold it to Jackson State College, Jackson State now owns it and operates it . . . for the students at Jackson State and their guests . . . ." Tr. of Oral Arg. 31. According to the record below, the Battlefield Park and Riverside Park pools, both in white neighborhoods, have remained closed but have been properly maintained and

[10] I agree fully with the majority that if a city or State becomes involved in any way in the operation of facilities on a segregated basis by private parties, the Fourteenth Amendment is violated. See *Burton* v. *Wilmington Parking Authority, supra,* n. 1; *Hampton* v. *City of Jacksonville,* 304 F. 2d 320 (CA5), cert. denied *sub nom. Ghioto* v. *Hampton,* 371 U. S. 911 (1962); *Smith* v. *Young Men's Christian Assn. of Montgomery,* 316 F. Supp. 899 (MD Ala. 1970) (city agreement with YMCA to coordinate city and YMCA recreational activities to eliminate duplication of services had as its primary purpose and effect encouragement and assistance of YMCA in maintaining segregated recreational facilities and programs); *Chinn* v. *Canton,* Civ. No. 3764 (SD Miss., Nov. 18, 1965) (unreported) (town leased municipal pool to private all-white association; pool ordered desegregated).

prevented from falling into disrepair by the city, although they produce no offsetting revenue. The Livingston Lake facility has apparently remained in its natural state.[11]

In August 1965, petitioners brought the present class action in the Southern District of Mississippi. They challenged the closing of the pools and racial segregation in the city jail, seeking both declaratory and injunctive relief. The case was tried on affidavits and stipulations and submitted to the District Judge. In addition to the evidence summarized above, Mayor Thompson filed an affidavit which stated:

> "Realizing that the personal safety of all of the citizens of the City and the maintenance of law and order would prohibit the operation of swimming pools on an integrated basis, and realizing that the said pools could not be operated economically on an integrated basis, the City made the decision subsequent to the Clark case to close all pools owned and operated by the City to members of both races." App. 21.[12]

Parks Director Kurts filed a similar affidavit, averring:

> "That after the decision of the Court in the case of Clark v. Thompson, it became apparent that the swimming-pools owned and operated by the City of Jackson could not be operated peacefully, safely, or economically on an integrated basis, and the City

---

[11] During the proceedings in this case, it was developed that the benches in the Livingston Park Zoo were removed in 1961, and that the public rest rooms in the Municipal Court Building were closed at some point in time. See *Palmer* v. *Thompson*, 419 F. 2d 1222, 1231 (CA5 1969) (dissenting opinion); affidavit of Allen C. Thompson, App. 21.

[12] The Mayor's affidavit makes no mention of "minor water difficulty."

decided that the best interest of all citizens required the closing of all public swimming pools owned and operated by the City . . . ." App. 18.[13]

Based on these affidavits, the District Judge found as a fact that the decision to close the pools was made after *Clark* v. *Thompson* and that the pools could not be operated safely or economically on an integrated basis. Accordingly, he held that petitioners were not entitled to any relief and dismissed the complaint. On appeal, a panel of the Court of Appeals for the Fifth Circuit affirmed. *Palmer* v. *Thompson*, 391 F. 2d 324 (1967). On rehearing *en banc*, the Court of Appeals, by a seven-to-six vote, again affirmed dismissal of the complaint. 419 F. 2d 1222 (1969). Both courts below rejected petitioners' argument that because the pools were closed to avoid court orders that would require their desegregation, the city's action was a denial of equal protection. We granted certiorari to decide that issue, 397 U. S. 1035 (1970), and for the reasons that follow I would reverse.

## II

There is no dispute that the closing of the pools constituted state action. Similarly, there can be no disagreement that the desegregation ruling in *Clark* v. *Thompson* was the event that precipitated the city's decision to cease furnishing public swimming facilities to its citizens.[14] Although the secondary evidence of what the city officials thought and believed about the wisdom of desegregation is relevant, it is not necessary to rely on it to establish the causal link between *Clark* v. *Thompson* and the closings. The officials' sworn affidavits,

---

[13] The Parks Director's affidavit makes no mention of "minor water difficulty."

[14] At oral argument, counsel for the city so conceded. Tr. of Oral Arg. 28–29.

accepted by the courts below, stated that loss of revenue and danger to the citizens would obviously result from operating the pools on an integrated basis. Desegregation, and desegregation alone, was the catalyst that would produce these undesirable consequences. Implicit in this official judgment were assumptions that the citizens of Jackson were of such a mind that they would no longer pay the 10- or 20-cent fee imposed by the city if their swimming and wading had to be done with their neighbors of another race, that some citizens would direct violence against their neighbors for using pools previously closed to them, and that the anticipated violence would not be controllable by the authorities. Stated more simply, although the city officials knew what the Constitution required after *Clark* v. *Thompson* became final, their judgment was that compliance with that mandate, at least with respect to swimming pools, would be intolerable to Jackson's citizens.

Predictions such as this have been presented here before. One year after the District Court's opinion in *Clark* v. *Thompson,* this Court reviewed a case in which municipal officials had made the same assumption and had acted upon it. In Memphis, Tennessee, *Brown* and the cases discussed above had little effect until May 1960, when Negro residents sued for declaratory and injunctive relief directing immediate desegregation of the municipal parks and other city-owned and city-operated recreational facilities. The city agreed that the Fourteenth Amendment required all facilities to be opened to citizens regardless of race and that the majority of city-run facilities remained segregated at the time of suit, six years after *Brown.* It was nevertheless asserted that desegregation was under way and that further delay in achieving full desegregation was the wise and proper course. Both of the lower courts denied plaintiffs relief, the net result being an order directing the city to submit

within six months a plan providing for gradual desegregation of all the city's recreational facilities.

This Court unanimously rejected further delay in integrating these facilities. *Watson* v. *City of Memphis,* 373 U. S. 526 (1963). It did so although the city asserted its good-faith attempt to comply with the Constitution and its honest belief that gradual desegregation, facility by facility, was necessary to prevent interracial strife. The Court's "compelling answer to this contention [was] that constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Id.,* at 535. See also *Buchanan* v. *Warley,* 245 U. S. 60, 81 (1917); *Brown* v. *Board of Education,* 349 U. S. 294, 300 (1955); *Cooper* v. *Aaron,* 358 U. S., at 16; *Wright* v. *Georgia,* 373 U. S. 284, 291–293 (1963). The record in the case was reviewed in some detail. I quote at length because of the pertinence of the Court's observations.

"Beyond this, however, neither the asserted fears of violence and tumult nor the asserted inability to preserve the peace was demonstrated at trial to be anything more than personal speculations or vague disquietudes of city officials. There is no indication that there had been any violence or meaningful disturbances when other recreational facilities had been desegregated. In fact, the only evidence in the record was that such prior transitions had been peaceful. The Chairman of the Memphis Park Commission indicated that the city had 'been singularly blessed by the absence of turmoil up to this time on this race question'; notwithstanding the prior desegregation of numerous recreational facilities, the same witness could point as evidence of the unrest or turmoil which would assertedly occur upon complete desegregation of such facilities only to a number of anonymous letters and phone calls

which he had received.   The Memphis Chief of
Police mentioned without further description some
'troubles' at the time bus service was desegregated
and referred to threatened violence in connection
with a 'sit-in' demonstration at a local store, but,
beyond making general predictions, gave no concrete
indication of any inability of authorities to main-
tain the peace.   The only violence referred to at any
park or recreational facility occurred in segregated
parks and was not the product of attempts at de-
segregation.   Moreover, there was no factual evi-
dence to support the bare testimonial speculations
that authorities would be unable to cope success-
·fully with any problems which in fact might arise
or to meet the need for additional protection should
the occasion demand.

"The existing and commendable goodwill between
the races in Memphis, to which both the District
Court and some of the witnesses at trial made ex-
press and emphatic reference as in some inexplicable
fashion supporting the need for further delay, can
best be preserved and extended by the observance
and protection, not the denial, of the basic constitu-
tional rights here asserted.   The best guarantee of
civil peace is adherence to, and respect for, the law.

"The other justifications for delay urged by the
city or relied upon by the courts below are no more
substantial, either legally or practically.   It was, for
example, asserted that immediate desegregation of
playgrounds and parks would deprive a number of
children—both Negro and white—of recreational
facilities; this contention was apparently based on
the premise that a number of such facilities would
have to be closed because of the inadequacy of the
'present' park budget to provide additional 'supervi-
sion' assumed to be necessary to operate unsegregated

playgrounds. As already noted, however, there is no warrant in this record for assuming that such added supervision would, in fact, be required, much less that police and recreation personnel would be unavailable to meet such needs if they should arise. More significantly, however, it is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them. We will not assume that the citizens of Memphis accept the questionable premise implicit in this argument or that either the resources of the city are inadequate, or its government unresponsive, to the needs of all of its citizens." 373 U. S., at 536–538 (footnotes omitted).

So it is in this case. The record before us does not include live testimony. It was stipulated by the parties after the District Judge had entered his order denying relief that the "parties had an opportunity to offer any and all evidence desired." The official affidavits filed were even less compelling than the evidence presented by city officials in *Watson*. The conclusion of city officials that integrated pools would not be "economical" was no more than "personal speculation." The city made no showing that integrated operation would increase the annual loss of at least $11,700—a loss that, prior to 1963, the city purposely accepted for the benefit of its citizens as long as segregated facilities could be maintained. The prediction that the pools could not be operated safely if they were desegregated was nothing more than a "vague disquietude." In *Watson,* the record reflected that the parks commissioner had received a number of anonymous phone calls and letters presumably threatening violence, and that the chief of police had testified about troubles in connection with a sit-in demonstration and desegregation of the city buses. Here, Mayor Thomp-

son's affidavit, filed in 1965, refers only to a time in 1961 "when racial tensions were inflamed by the visits of the freedom riders to Jackson." Both the Thompson and Kurts affidavits assert that all other public recreational facilities in Jackson were desegregated following *Clark* v. *Thompson.* Neither affidavit contains the slightest hint—in general or specific terms—that this transition caused disorder or violence.[15] As in *Watson,* there is no factual evidence that city law enforcement authorities would be unable to cope with any disturbances that might arise; unlike *Watson,* however, there is in this record not even a "bare testimonial speculation" that this would be the case.

With all due respect, I am quite unable to agree with the majority's assertion, *ante,* at 225, that there is "substantial evidence in the record" to support the conclusion of the lower courts that the pools could not be operated safely and economically on an integrated basis. Officials may take effective action to control violence or to prevent it when it is reasonably imminent. But the anticipation of violence in this case rested only on unsupported assertion, to which the *permanent* closing of swimming pools was a wholly unjustified response. The city seems to fear that even if some or all of the pools suffered a sharp decline in revenues from the levels pertaining before 1963 because Negro and white neighbors refused to use integrated facilities, the city could never close the pools for that reason. I need only ob-

---

[15] In its brief, the city argues: "This Court will take judicial knowledge of the fact that there still exists a serious danger of violent clashes between young people of different racial groups, whether stemming from acts of or promoted by one group or the other." Respondents' Brief 10. But this is, as noted in the text, contrary to the record developed in the courts below. Moreover, at oral argument counsel for the respondents stated that to his knowledge there has been no interracial violence in Jackson since the 1961 Freedom Rider incidents. See Tr. of Oral Arg. 36.

serve that such a case, if documented by objective record evidence, would present different considerations. As Judge Wisdom stated below, "We do not say that a city may never abandon a previously rendered municipal service. If the facts show that the city has acted in good faith for economic or other nonracial reasons, the action would have no overtones of racial degradation, and would therefore not offend the Constitution." 419 F. 2d, at 1237 n. 16 (dissenting opinion). It is enough for the present case to re-emphasize that the only evidence in this record is the conclusions of the officials themselves, unsupported by even a scintilla of added proof.

*Watson* counsels us to reject the vague speculation that the citizens of Jackson will not obey the law, as well as the correlative assumption that they would prefer no public pools to pools open to all residents who come in peace. The argument based on economy is no more than a claim that a major portion of the city's population will not observe constitutional norms. The argument based on potential violence, as counsel for the city indicated at oral argument, unfortunately reflects the views of a few immoderates who purport to speak for the white population of the city of Jackson. Tr. of Oral Arg. 36. Perhaps it could have been presented, but there is no evidence now before us that there exists any group among the citizens of Jackson that would employ lawless violence to prevent use of swimming pools by Negroes and whites together. In my view, the Fourteenth Amendment does not permit any official act—whether in the form of open refusal to desegregate facilities that continue to operate, decisions to delay complete desegregation, or closure of facilities—to be predicated on so weak a reed. Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply

held. Surely the promise of the Fourteenth Amendment demands more than nihilistic surrender. As Mr. Justice Frankfurter observed more than 12 years ago:

> "The process of ending unconstitutional exclusion of pupils from the common school system—'common' meaning shared alike—solely because of color is no doubt not an easy, overnight task in a few States where a drastic alteration in the ways of communities is involved. Deep emotions have, no doubt, been stirred. They will not be calmed by letting violence loose—violence and defiance employed and encouraged by those upon whom the duty of law observance should have the strongest claim—nor by submitting to it under whatever guise employed. Only the constructive use of time will achieve what an advanced civilization demands and the Constitution confirms." *Cooper* v. *Aaron,* 358 U. S., at 25 (concurring opinion).

### III

I thus arrive at the question of whether closing public facilities to citizens of both races, whatever the reasons for such action, is a special kind of state action somehow insulated from scrutiny under the Fourteenth Amendment. As the opinions of the majority and MR. JUSTICE DOUGLAS show, most of our prior decisions, because of their facts, do not deal with this precise issue.

*Bush* v. *Orleans Parish School Board,* 187 F. Supp. 42 (ED La. 1960), aff'd, 365 U. S. 569 (1961), is relevant. In that case, a three-judge court declared unconstitutional a number of Louisiana statutes designed to avoid desegregation of the public schools in that State. Among the laws stricken down was a statute giving the Governor the right to close any school ordered to integrate, a statute giving the Governor the right to close all schools if one was integrated, and a statute giving the Governor

the right to close any school threatened with violence or disorder. We affirmed the District Court summarily and without dissent. *Ibid.*[16] See also *Hall* v. *St. Helena*

---

[16] I cannot agree with the majority's attempt to discount the significance of *Bush.* First, the action taken in *Bush* in no sense depended on our conclusion in *Brown* that the provision of public education was an especially important state function. Had that been the case, and had. recreational facilities somehow been considered less essential, the Court should have accepted the argument made by some States that *Brown* not be extended to recreational facilities. This we did not do. See *Dawson, supra,* and *Holmes, supra.* Similarly, if such a distinction was at all tenable, the extension of the "all deliberate speed" approach to desegregating public facilities might have been appropriate. But this argument was also emphatically rejected. See *Watson, supra,* at 529–530. When a public agency furnishes a service—regardless of whether or not it is an "essential" one—it must act in a nondiscriminatory manner with regard to that service.

Second, even accepting the majority's characterization of public schools as "important," there is much in our previous decisions to contradict its implication that providing swimming pools and other public recreational facilities is not a significant state function. In *Evans* v. *Newton,* 382 U. S. 296, 302 (1966), the Court stated:

"A park . . . is more like a fire department or police department that traditionally serves the community. Mass recreation through the use of parks is plainly in the public domain, *Watson* v. *Memphis,* 373 U. S. 526; and state courts that aid private parties to perform that public function on a segregated basis implicate the State in conduct proscribed by the Fourteenth Amendment."

See also *Evans* v. *Abney,* 396 U. S. 435, 443–444, 445 (1970), where MR. JUSTICE BLACK, writing for the Court, stated:

"When a city park is destroyed because the Constitution requires it to be integrated, there is reason for everyone to be disheartened. We agree with petitioners that in such a case it is not enough to find that the state court's result was reached through the application of established principles of state law. No state law or act can prevail in the face of contrary federal law, and the federal courts must search out the fact and truth of any proceeding or transaction to determine if the Constitution has been violated.

A second argument for petitioners stresses the similarities be-

*Parish School Board,* 197 F. Supp. 649 (ED La. 1961), aff'd, 368 U. S. 515 (1962).

*Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218 (1964), is perhaps distinguishable,

tween this case and the case in which a city holds an absolute fee simple title to a public park and then closes that park of its own accord solely to avoid the effect of a prior court order directing that the park be integrated as the Fourteenth Amendment commands. Yet, assuming *arguendo* that the closing of the park would in those circumstances violate the Equal Protection Clause, that case would be clearly distinguishable from the case at bar because there it is the State and not a private party which is injecting the racially discriminatory motivation. In the case at bar there is not the slightest indication that any of the Georgia judges involved were motivated by racial animus or discriminatory intent of any sort in construing and enforcing Senator Bacon's will."

This was the inquiry made in *Bush,* and it led to striking down the statutes in question. We affirmed that ruling, and the record here is no less clear. And as the majority concedes, *ante,* at 221 n. 6; surely it is not irrelevant in considering the context in which Jackson's pools were closed, that a statute of the State of Mississippi, in effect since 1956, provides:

"That the entire executive branch of the government of the State of Mississippi, and of its subdivisions, and all persons responsible thereto, including the governor, the lieutenant governor, the heads of state departments, sheriffs, boards of supervisors, constables, mayors, boards of aldermen and other governing officials of municipalities by whatever name known . . . whether specifically named herein or not . . . shall give full force and effect in the performance of their official and political duties, to the Resolution of Interposition . . . and all of said members of the executive branch be and they are hereby . . . directed and required to prohibit, by any lawful, peaceful and constitutional means, the implementation of or the compliance with the Integration Decisions of the United States Supreme Court of May 17, 1954 (347 US 483), . . . and of May 31, 1955 (349 US 294), . . . and to prohibit by any lawful, peaceful, and constitutional means, the causing of a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly in this state, by any branch of the federal government, any person employed by the federal government, any commission, board or

but only if one ignores its basic rationale and the purpose and direction of this Court's decisions since *Brown*. First, and most importantly, *Griffin* stands for the proposition that the reasons underlying certain official acts are highly relevant in assessing the constitutional validity of those acts. We stated:

> "But the record in the present case could not be clearer that Prince Edward's public schools were closed and private schools operated in their place with state and county assistance, for one reason, and one reason only: to ensure, through measures taken by the county and the State, that white and colored children in Prince Edward County would not, under any circumstances, go to the same school. Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one; and grounds of race and opposition to desegregation do not qualify as constitutional." 377 U. S., at 231.

See also *Gomillion* v. *Lightfoot,* 364 U. S. 339, 346–348 (1960); *Board of Education* v. *Allen,* 392 U. S. 236, 243 (1968); *Epperson* v. *Arkansas,* 393 U. S. 97, 109 (1968); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205 (1970); Note, Legislative Purpose and Federal Constitutional Adjudication, 83 Harv. L. Rev. 1887 (1970). Second,

---

agency of the federal government, or any subdivision of the federal government, and to prohibit, by any lawful, peaceful and constitutional means, the implementation of any orders, rules or regulations. of any board, commission or agency of the federal government, based on the supposed authority of said Integration Decisions, to cause a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly in this state." Miss. Code Ann. § 4065.3 (1957); see *United States* v. *City of Jackson,* 318 F. 2d 1, 5–6 (CA5 1963). (judicial notice taken of this statute).

*Griffin* contains much that is relevant to the kind of decree that would be appropriate if the decision below is reversed. See 377 U. S., at 232–234.

The majority, conceding the relevance of the quoted passage from *Griffin*, states that the "focus in [both *Griffin* and *Gomillion*] was on the actual effect of the enactments, not upon the motivation which led the States to behave as they did." Respondents agree, and argue further that the present record shows only that Jackson has closed facilities that were once open on a segregated basis and that the closing operates equally on Negroes and whites alike.

But if effect was all that the Court considered relevant in *Griffin*, there was no need to mention underlying purpose and to stress the delay that took place in Virginia in implementing *Brown*.[17] More importantly, *Griffin* was only one case in a series stressing that the Fourteenth Amendment rights "declared by this Court in the *Brown* case can neither be nullified openly and directly by state legislators or state executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.' *Smith* v. *Texas*, 311 U. S. 128, 132." *Cooper* v. *Aaron, supra,* at 17. It seems to me neither wise nor warranted to limit this principle in a case where the record is as clear as is the one presently before us.

State action predicated solely on opposition to a lawful court order to desegregate is a denial of equal protection of the laws. As Judge Wisdom said in dissent below, the argument that the closing of the pools operated equally on Negroes and whites "is a tired contention, one that has been overworked in civil rights cases." 419 F. 2d, at 1232 (dissenting opinion). It was made and rejected in *Griffin*. See, *e. g.,* Brief of Respondent Board of Super-

---

[17] See also *Green, supra,* n. 3.

visors of Prince Edward County in *Griffin* 57–84.[18] It was advanced and rejected in different contexts in *Anderson* v. *Martin*, 375 U. S. 399 (1964) (designation of race on ballots), and *Loving* v. *Virginia*, 388 U. S. 1 (1967) (miscegenation law). The same argument was rejected in *Hunter* v. *Erickson*, 393 U. S. 385, 391 (1969), where we stated that "although the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority. The majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that."

Here, too, the reality is that the impact of the city's act falls on the minority. Quite apart from the question whether the white citizens of Jackson have a better chance to swim than do their Negro neighbors absent city pools, there are deep and troubling effects on the racial minority that should give us all pause. As stated at the outset of this opinion, by closing the pools solely because of the order to desegregate, the city is expressing its official view that Negroes are so inferior that they are unfit to share with whites this particular type of public facility, though pools were long a feature of the city's segregated recreation program. But such an official position may not be enforced by designating certain pools for use by whites and others for the use of Negroes. Closing the pools without a colorable nondiscriminatory reason was every bit as much an official endorsement of

[18] In their briefs in *Griffin*, No. 592, O. T. 1963, the respondents relied on previous lower court cases that have permitted closing public recreational facilities after decrees had been entered ordering that they be desegregated. See Brief of Respondent Board of Supervisors in *Griffin* 65–66. See also Brief of Respondents State Board of Education and Superintendent of Public Instruction in *Griffin* 53–63. *Griffin* rejected the relevance of these decisions; however, the present respondents rely on them here and the majority implicitly embraces them.

the notion that Negroes are not equal to whites as was the use of state National Guard troops in 1957 to bar the entry of nine Negro students into Little Rock's Central High School, a public facility that was ordered desegregated in the wake of *Brown*. See *Cooper* v. *Aaron,* 358 U. S., at 11. Both types of state actions reflect implementation of the same official conclusion: Negroes cannot be permitted to associate with whites. But that notion had begun to break down as this Court struggled with the "separate but equal" doctrine, see *Brown,* 347 U. S., at 491–494,[19] and I had thought it was emphatically laid to rest in *Brown* itself, where we quoted with approval the finding of a district judge that:

> " 'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of the negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.' " 347 U. S., at 494.

---

[19] The Court in *Brown* noted that in *Sweatt* v. *Painter,* 339 U. S. 629 (1950), the Court had held that a segregated law school for Negroes could not provide them equal educational opportunities, relying in large part on "those qualities which are incapable of objective measurement but which make for greatness in a law school." 339 U. S., at 634. The Court in *Brown* also relied on *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637 (1950), in which it was required that a Negro student in a white graduate school be treated like all other students in order to avoid impairing "his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession." 339 U. S., at 641.

These considerations were not abandoned as *Brown* was applied in other contexts, and it is untenable to suggest that the closing of the swimming pools—a pronouncement that Negroes are somehow unfit to swim with whites—operates equally on Negroes and whites. Whites feel nothing but disappointment and perhaps anger at the loss of the facilities. Negroes feel that and more. They are stigmatized by official implementation of a policy that the Fourteenth Amendment condemns as illegal. And the closed pools stand as mute reminders to the community of the official view of Negro inferiority.

Moreover, this Court has carefully guarded the rights of Negroes to attack state-sanctioned segregation through the peaceful channels of the judicial process. This Court has recently discussed and analyzed various provisions of the Reconstruction civil rights statutes, and there is little need here to repeat anything more than the most recent observation that "[t]he approach of this Court . . . has been to 'accord [these statutes] a sweep as broad as [their] language.' " *Griffin* v. *Breckenridge, ante,* p. 88, at 97.[20] Of course, 42 U. S. C. § 1981 specifically declares that "[a]ll persons . . . shall have the same right . . . to sue . . . as is enjoyed by white citizens . . . ." Congress has supplemented this early legislation, and this Court has commented on the importance of private plaintiffs in enforcing civil rights statutes. *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400, 401–402 (1968); see also *NAACP* v. *Alabama,* 357 U. S. 449 (1958). The Civil Rights Act of 1964 provided an additional avenue for a potential private plaintiff to follow. Provisions of that Act authorize the Attorney General to bring a civil suit in the name of the United States whenever he receives a signed complaint in writing

---

[20] Quoting *United States* v. *Price,* 383 U. S. 787, 801 (1966); see also *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144 (1970); *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968).

from an individual that such person is-being denied equal protection of the laws by being denied equal utilization of any public facilities such as those involved in the present case. 42 U. S. C. § 2000b (a). The Attorney General may bring such a suit if he believes the complaint to be meritorious and certifies that the signer of the complaint is unable, in his judgment, to initiate and maintain an appropriate private suit. *Ibid.* The statute further defines when the Attorney General may deem a complainant unable to initiate or maintain a private action, specifying inability to bear the expense of private litigation and the possibility that "the institution of such litigation would jeopardize the personal safety, employment, or economic standing of such person or persons, their families, or their property." 42 U. S. C. § 2000b (b).

It is evident that closing a public facility after a court has ordered its desegregation has an unfortunate impact on the minority considering initiation of further suits or filing complaints with the Attorney General. As Judge Wisdom said, "[T]he price of protest is high. Negroes . . . now know that they risk losing even segregated public facilities if they dare to protest . . . segregated public parks, segregated public libraries, or other segregated facilities. They must first decide whether they wish to risk living without the facility altogether . . . ." 419 F. 2d, at 1236 (dissenting opinion). It is difficult to measure the extent of this impact, but it is surely present and surely we should not ignore it. The action of the city in this case interposes a major deterrent to seeking judicial or executive help in eliminating racial restrictions on the use of public facilities.[21] As such, it is illegal under the

---

[21] Nor should we be lulled by the suggestion that all of Jackson's public facilities have been integrated. As the majority correctly states, "[i]f the time ever comes when Jackson attempts to run segregated public pools either directly or indirectly, or partici-

Fourteenth Amendment. See *Shapiro* v. *Thompson,* 394 U. S. 618, 631 (1969); *United States* v. *Jackson,* 390 U. S. 570, 581 (1968); *Dombrowski* v. *Pfister,* 380 U. S. 479, 486–487 (1965); see also *Oregon* v. *Mitchell,* 400 U. S. 112, 292 (1970) (STEWART, J., concurring and dissenting).

## IV

From what has been stated above, it is clear that the city's action in closing the pools because of opposition to the decision in *Clark* v. *Thompson* was "an exercise of the state police power which trenches upon the constitutionally protected freedom from invidious official discrimination based on race." *McLaughlin* v. *Florida,* 379

---

pates in a subterfuge whereby pools are nominally run by 'private parties' but actually by the city, relief will be available in the federal courts." This is but a partial summary of the litigation that may lie ahead as some cities attempt to avoid the requirement that public facilities be operated on an integrated basis. It demonstrates that it is surely wrong to suggest that simply because a city presently operates no segregated facilities there is nothing that will need to be done by way of litigation to enforce the Fourteenth Amendment in the future. Assume for instance that it can be shown that a city is providing some form of covert assistance to a "private" organization such as the YMCA to run swimming pools on a segregated basis, one for the whites and one for the Negroes; another example would be a "desegregated" public school offering segregated classes, perhaps including physical education and swimming. Although we are all agreed that such conduct is illegal, the majority apparently believes that allowing a city to close public facilities solely because of opposition to desegregation would exert no effect whatsoever on the deliberations of Negro plaintiffs considering a court challenge to these newer, more subtle discriminatory practices. See n. 10, *supra.* To me, it is clear that the majority's edict places a powerful weapon at the disposal of public officials hostile to fulfilling the promise of the Fourteenth Amendment. Threat of suit by Negroes in either case hypothesized above is likely to be countered by a threat, and perhaps action, to close the covertly run segregated pools—in schools or outside.

U. S. 184, 196 (1964). As such, it "bears a heavy burden of justification . . . and will be upheld only if it is necessary, and not merely rationally related, to the accomplishment of a permissible state policy." *Ibid.;* see also *Loving* v. *Virginia,* 388 U. S. 1 (1967). The city has only opposition to desegregation to offer as a justification for closing the pools, and this opposition operates both to demean the Negroes of Jackson and to deter them from exercising their constitutional and statutory rights. The record is clear that these public facilities had been maintained and would have been maintained but for one event: a court order to open them to all citizens without regard to race. I would reverse the judgment of the Court of Appeals and remand the cause for further proceedings.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE WHITE join, dissenting.

While I am in complete agreement with the opinions of JUSTICES DOUGLAS and WHITE, I am obliged to add a few words of my own.

First, the majority and concurring opinions' reliance on the "facially equal effect upon all citizens" of the decision to discontinue all public pools is misplaced. As long ago as 1948 in *Shelley* v. *Kraemer,* 334 U. S. 1, 22, this Court held:

> "The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights. It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white persons rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities."

In short, when the officials of Jackson, Mississippi, in the circumstances of this case detailed by MR. JUSTICE WHITE denied a single Negro child the opportunity to go swimming simply because he is a Negro, rights guaranteed to that child by the Fourteenth Amendment were lost. The fact that the color of his skin is used to prevent others from swimming in public pools is irrelevant.

Second, since *Brown* v. *Board of Education,* 347 U. S. 483 (1954), public schools and public recreational facilities such as swimming pools have received identical Fourteenth Amendment protection. Indeed, exactly one week after *Brown I* this Court remanded three cases in the *same* per curiam: *Florida ex rel. Hawkins* v. *Board of, Control of Florida; Tureaud* v. *Board of Supervisors;* and *Muir* v. *Louisville Park Theatrical Assn.,* 347 U. S. 971. The first two involved university *education* and the latter involved *recreational facilities.*

Even before *Brown II,* 349 U. S. 294 (1955), it was recognized as obvious that "racial segregation in recreational activities can no longer be sustained as a proper exercise of the police power of the State; for if that power cannot be invoked to sustain racial segregation in the schools, where attendance is compulsory and racial friction may be apprehended from the enforced commingling of the races, it cannot be sustained with respect to public beach and bathhouse facilities, the use of which is entirely optional." *Dawson* v. *Mayor and City Council of Baltimore,* 220 F. 2d 386, 387 (CA4), aff'd *per curiam,* 350 U. S. 877 (1955). See also *Department of Conservation & Development* v. *Tate,* 231 F. 2d 615 (CA4), cert. denied, 352 U. S. 838 (1956).

By effectively removing publicly owned swimming pools from the protection of the Fourteenth Amendment—at least if the pools are outside school buildings—the majority and concurring opinions turn the clock back 17 years. After losing a hard fought legal battle to

maintain segregation in public facilities, the Jackson, Mississippi, authorities now seek to pick and choose* which of the existing facilities will be kept open. Their choice is rationalized on the basis of economic need and is even more transparent than putting the matter to a referendum vote.

Finally, I cannot conceive why the writers of the concurring opinions believe that the city is "locked in" and must operate the pools no matter what the economic consequences. Certainly, I am not bound by any admission of an attorney at oral argument as to his version of the law. Equity courts have always had continuing supervisory powers over their decrees; and if a proper basis for closing the facilities—other than a conclusory statement about the projected human and thus economic consequences of desegregation—could be shown, swimming pools, as I imagine schools or even golf courses, could be closed.

I dissent.

---

*The economic loss incident to the operation of public swimming pools could not be much more than that incident to maintaining public golf courses that charge green fees of $0.75 to $1.25, admittedly the lowest in the country.