Peter A. THOMASON, Christine Jones, Rev. Charles Irvin, Rev. Levon Yuille, and Lois Jungkuntz, Plaintiffs,

v.

Jerry JERNIGAN, Ann Marie Coleman, Larry Hunter, Ingrid Shelton, Nelson K. Meade, Liz Brater, Jerry Schleicher, Mark Ouimet, Joe Borda, Thais Peterson, the City of Ann Arbor, and the Police Department of the City of Ann Arbor, Defendants.

No. 90–73335.

United States District Court, E.D. Michigan, S.D.

July 17, 1991.

Steven Jentzen, Ypsilanti, Mich., and Walter Weber, New Hope, Ky., for plaintiffs.

Bruce Laidlaw and Kristen Larcom, Ann Arbor, Mich., for defendants.

Mark Brewer, Detroit, Mich., for amicus ACLU Fund of Michigan, supporting plaintiffs.

Jerold Lax, Ann Arbor, Mich., for amicus Planned Parenthood of Mid–Michigan, supporting defendants.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This is a civil rights case, 42 U.S.C. § 1983. Plaintiffs Peter A. Thomason (Thomason), Christine Jones (Jones), Reverend Charles Irvin, Reverend Levon Yuille, and Lois Jungkuntz (Jungkuntz) (collectively, "the protestors") are anti-abortion activists. They initially asserted that the City of Ann Arbor, Michigan (the City); its mayor; the members of the Ann Arbor City Council (the City Council); and the Ann Arbor Police Department[1] acted or threatened to act to deny them their right to free speech under the First Amendment by vacating public pedestrian and parking access to the cul-de-sac in front of a clinic owned and operated by Planned Parenthood of Mid–Michigan (Planned Parenthood). The protestors alleged that the City Council's action was intended to prevent them from engaging in a variety of expressive activities protected by the First Amendment because the vacation turned a public street into private property.

The vacation resolution was adopted by the City Council on September 4, 1990. After a hearing on November 21, 1990, the Court granted the protestors' motion for a temporary restraining order. Subsequently, the City Council revisited the issue and, on January 22, 1991, vacated in its entirety the public right of way in and around the cul-de-sac, reserving only an easement for public utility purposes. The protestors then filed a supplemental complaint challenging the January 22, 1991 action on First Amendment grounds.

---

1. On June 7, 1991, the Court entered an order dismissing Washtenaw County Prosecuting Attorney William Delhey from the case.

The protestors ask for an injunction permanently enjoining the defendants from attempting to enforce trespass laws against them for engaging in expressive activities in the cul-de-sac, and a declaratory judgment that the City Council's actions were unconstitutional. The parties agreed to consolidate the hearing on the request for a preliminary injunction with a trial on the merits, Fed.R.Civ.P. 65(a)(2). Following a hearing[2] on May 23, 1991, the parties filed post-trial briefs with the Court. Because the Court now finds that the City Council's actions constitute an infringement of the protestors' First Amendment rights, the request for an injunction will be granted and a declaratory judgment that the vacation is unconstitutional will be entered.

## II.

### A.

In 1984, Planned Parenthood built a new facility on a parcel of land located at 3100 Professional Drive in Ann Arbor. At that time, Professional Drive was a paved street running east and west that terminated in a dead end at the east side of the property line of Planned Parenthood. On May 21, 1984, the City, through the City Council, accepted the dedication of an easement for "road right-of-way" purposes on a portion of Planned Parenthood's property.

As part of the planning approval for the Planned Parenthood clinic, Planned Parenthood agreed to build a cul-de-sac on its property to facilitate vehicles turning around as they entered the property. Planned Parenthood then extended the paved roadway of Professional Drive to abut the front end of its building and also constructed the cul-de-sac. The construction of the cul-de-sac included a sidewalk along the south side that extends through the dedicated portion of Professional Drive onto the private property of Planned Parenthood. The public right of way encompasses a circle, with a 60-foot radius, the center of which is located in the middle of the paved cul-de-sac. The eastern-most portion of the circle overlaps part of the straight portion of Professional Drive. The public portion of the sidewalk is approximately 60 feet long. The cul-de-sac also includes a grassy strip between the pavement and the sidewalk and, at its west end, a portion of a small, landscaped island. A sketch of the area involved is attached as Exhibit A.

Since 1985, the protestors and others opposing the right to abortion have gathered in and around the cul-de-sac and engaged, *inter alia*, in activities such as prayer, picketing, distribution of literature, and "sidewalk counseling"[3] of Planned Parenthood patients. Currently, the protestors and others generally engage in their protest activities on Wednesday, Thursday, and Saturday. According to the protestors, these activities last for no more than 90 minutes on each day. The activities take place primarily in the street portion of the cul-de-sac. Indeed, the ability to stand in the street on the west end of the cul-de-sac is viewed by the protestors as essential to the effective communication of their message.

From February 1989 through September 1990, the Ann Arbor Police Department received 27 complaints from Planned Parenthood regarding protest activities. This volume of complaints placed a significant strain on law enforcement resources, according to the Police Department. At least a third of the complaints resulted from peaceful protests that required no police action. However, the complaints do include the arrests of plaintiffs Jungkuntz, Thomason, and Jones for trespassing on private property.

Several of the complaints involved protestors standing in the street and blocking

---

**2.** At the hearing, the defendants said that they were satisfied with the state of the record and that there was no need to hold an evidentiary hearing.

**3.** "Sidewalk counseling," a term used by the protestors, is a misnomer because, as stated by plaintiff Thomason in his affidavit, the only sidewalk involved in this case is too far away from the front entrance of the Planned Parenthood building to provide a practical location for counseling. Therefore, Thomason's affidavit explains, the protestors normally walk back and forth on the street at the west end of the cul-de-sac. As a result, the Court will refer to the protestors' actions as "street counseling."

traffic, but it is unclear whether the police ever attempted to arrest protestors for doing so. The Patrol Division Deputy Chief of the City's Police Department, says that the police have been ineffective in deterring protestors from standing in the street because, by the time that the police arrive, the demonstrators are no longer blocking traffic. The police apparently have not attempted to discourage street activity by maintaining a constant presence at the scene on protest days. Rather, they appear merely to respond to complaints.

### B.

The legislative history underlying the adoption of the resolutions vacating the cul-de-sac is as follows. On June 21, 1990, Planned Parenthood's attorney sent a letter to the City's Planning Director requesting that the City vacate the previously dedicated portion of Professional Drive because anti-abortion protestors were interfering with Planned Parenthood's operations. The request was referred to the City's Planning Commission (the Planning Commission).

In advance of the meeting of the Planning Commission scheduled for August 14, 1990, the Planning Department staff prepared a report recommending vacation of public pedestrian access to the cul-de-sac. The report recommended this action in order to "retain the access rights of everyone who currently ha[s] rights to the area, except pedestrians," and suggested that signs be posted advising the public that the sidewalks are private. The staff report noted that the objective of Planned Parenthood in seeking the vacation was to allow "better control of protestors who block access to the Planned Parenthood clinic" and that moving the boundary of Planned Parenthood's property would "distance protestors from the building" and "limit harassment of patrons and act as a disincentive to protestors." The staff report also stated that vehicular use of the turnaround was necessary for traffic access and the access of City maintenance vehicles and that "a fire lane must be maintained." Finally, the staff report stated:

> Vacating the cul-de-sac may help the petitioner and the police control access to the site during protests, but it may relo-

cate the problem to other parts of Professional Drive which would impact other sites. Parking on Professional Drive is extensively used. Vacating the cul-de-sac would remove up to six spaces from public use. It is City policy to terminate dead-end public streets with a cul-de-sac that accommodates automobiles and allows maintenance and emergency vehicles sufficient space to turn around.... The request to vacate the cul-de-sac should be limited to public pedestrian access only.

Attached to the staff report was a memorandum dated August 2, 1990, from the Patrol Division Deputy Chief to the City Planner. In the memorandum, the Patrol Division Deputy Chief said: "With the existing public right-of-way the Police Department *cannot* effectively control crowd nuisances and traffic problems at the Planned Parenthood location.... Our experience with protests is that they tend to occur on weekends (Saturday), and tend to last until the police can control the situation." He also noted that the request for vacation of the cul-de-sac was made "in response to a specific problem with protestors" and expressed his support for the request.

On August 14, 1990, the Planning Commission conducted a public hearing on Planned Parenthood's request to vacate the cul-de-sac. After a brief description and viewing of slides of the property, the Planning Commission opened the floor to the public for discussion. The only speaker present was Planned Parenthood's attorney. He stated that the request for the vacation was prompted by "the demonstrations against [Planned Parenthood's] functions" and that the vacation "would enhance [police] ability to control the area." The public hearing then was closed.

According to the minutes of the meeting, the City Planning Director stated that the Police Department's main concern was that people not be allowed to demonstrate right next to the building because demonstrators harass and counsel people entering the building. He also said that "the Police

Department feels that if there is no public space in front of the building, the demonstrations would either be diminished or eliminated." The City Planning Director also mentioned that Planned Parenthood suggested that the vacation include the elimination of parking in the cul-de-sac. Following these remarks, the Planning Commission voted to amend the request for vacation of pedestrian access to include parking.

Planned Parenthood's petition was not reviewed by the City Attorney prior to the Planning Commission's public hearing. A motion to table action until after the City Attorney's review failed. Ultimately, the Planning Commission voted 5 to 3 in favor of granting the petition. This margin was not enough for approval (the City Code requires six votes to make a recommendation to the City Council), resulting in a "technical denial."

On August 28, 1990, the City Attorney sent a one-page memorandum to the City Planning Director. In the memorandum, the City Attorney said that the purpose of the vacation was "to enable the City to enforce the State trespass law as to demonstrators within the cul-de-sac area." He also said that he had consulted with the County Prosecutor who assured him that, if the vacation were approved, the County would prosecute "persons improperly using the cul-de-sac area." He concluded that the proposed vacation could provide a "valuable law enforcement tool" to address the situation on Professional Drive.

On September 4, 1990, at a regular City Council meeting, the City Council conducted a public hearing on the proposed vacation. Notice of the hearing was published on August 26, 1990. At the public hearing, a number of speakers, including Thomason, voiced opinions on the matter, both for and against the proposed vacation. Following the hearing, the City Council approved a resolution vacating pedestrian and parking access to the cul-de-sac. This case followed.

On January 22, 1991, at a regular City Council meeting, the City Council conducted a second public hearing. The legislative history does not include the form of public notice, if there was one, of the hearing. No one spoke at the hearing. No new information as to the situation on Professional Drive was provided to the City Council prior to the hearing. The City Council then approved a resolution vacating all public access to the cul-de-sac, except access for public utility purposes.

The City Council's action on January 22, 1991 apparently was taken solely in response to remarks made by the Court during the hearing on November 21, 1990. At that hearing, the Court raised the question of whether the partial vacation of an easement, creating a public street on which motorists could drive but not park, and on which pedestrians could not walk, was permissible under Michigan law. As far as the Court can tell, the resolution of January 22, 1991 was adopted without any formal review by the City Planning Commission or input from any other City Department.

III.

A.

In its Memorandum of January 30, 1991 explaining its reasons for granting the plaintiffs' request for a temporary restraining order, the Court said that the case presented a potentially dispositive question of state property law, whether a municipality could vacate public pedestrian access to property dedicated for roadway purposes, and that *Pullman* abstention, *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), might be appropriate. With the City Council's action of January 22, 1991, the Court is satisfied that any potentially dispositive question of state property law is now moot. In their papers, the protestors argue both that a partial vacation is invalid under Michigan law and that the City Council's action of January 22, 1991 was taken in bad faith and violates Michigan law. However, because neither the protestors' initial complaint nor their supplemental complaint contains any allegations or claims under state law, the Court will assume that the

City Council's actions are not inconsistent with state law. Certainly, the protestors may challenge the validity of the City's actions on state law grounds in a state court if they so choose.

### B.

As to the federal claims raised by the protestors, the City first says that any state action is not sufficient to support a claim under the Fourteenth Amendment or 42 U.S.C. § 1983. The argument lacks merit. This case is based on two resolutions passed by the Ann Arbor City Council. Nothing could more clearly be state action. To argue, as the City does, that the case merely involves the action of a private property owner is a poorly disguised attempt to revive the argument that Planned Parenthood, which filed an amicus curiae brief,[4] is a necessary party to this action. The Court characterized that argument as "silly" in its Memorandum of January 30, 1991. No further comment is warranted.

### IV.

At the hearing on May 23, 1991, and again in their post-trial brief, the City emphasized the unassailable nature of the City Council's decision-making process, arguing that the Court may not strike down an otherwise constitutional act on the basis of an allegedly illicit motive. Relying on cases that have upheld the criminality of draft-card burning, *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and the constitutionality of closing public swimming pools rather than desegregating them, *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the City asserts that the Court may not use the lack of a sufficient legislative record as a basis for invalidating the City Council's action. The Court agrees with this general proposition but must say that the City's argument is largely irrelevant.

As the City emphasizes in its brief, the Court should not engage in a search for the motives of legislators, but for an inevitable unconstitutional effect resulting from their actions. If improper motivation became the sole basis for a judge's decision, then any legislative body could circumvent the decision by reenacting the legislation after creating a record expressing proper motivation. *Palmer*, 403 U.S. at 225, 91 S.Ct. at 1945. However, such a sound judicial policy cannot entirely insulate the actions of the City Council from judicial review. In *Palmer*, the Supreme Court assessed the validity of Jackson, Mississippi's decision to close its public swimming pools by reviewing the record made in the trial court and then determined that there was no evidence to support a finding that Jackson was directly or indirectly involved in the funding or operation of any swimming pools. *Id.* at 222, 91 S.Ct. at 1943. Leaving aside Jackson's motivations for closing the pools, the Court found no violation of the equal protection clause of the Fourteenth Amendment because the facts did not show state action affecting blacks differently from whites.

The Court will take the same route in this case. Regardless of the City's motivations, certain facts are inescapable. The City Council's action converts public property used for protest activity by a single group of protestors into private property. This case presents the question of whether that action constitutes the impermissible destruction of a public forum. Thus, despite the City's assertions, there is no reason for the Court to view this case any differently from any other matter involving the First Amendment. If the City Council's action destroys a public forum, it is well within the Court's power, under the authority of both *O'Brien* and *Palmer*, to invalidate the action.

### A.

#### 1.

Streets and sidewalks are traditional public fora, places that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964,

---

**4.** The American Civil Liberties Union filed an amicus curiae brief on behalf of the protestors.

83 L.Ed. 1423 (1939). In a public forum, the government may not prohibit all communicative activity. Moreover, regulation of speech activity on government property that has been traditionally open to the public for expressive activity—including streets, parks, and sidewalks, regardless of where title rests—must be judged by stringent standards. *Frisby v. Schultz*, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988).

All public streets are properly considered traditional public fora. *Id.* While not every public sidewalk is a public forum, nothing in the record suggests that the portion of the sidewalk contained within the easement prior to September 4, 1990 is distinguishable, in location or purpose, from any other public sidewalk in Ann Arbor. *United States v. Kokinda*, —— U.S. ——, ——, 110 S.Ct. 3115, 3120–21, 111 L.Ed.2d 571, 582–83 (1990); *United States v. Grace*, 461 U.S. 171, 178–80, 103 S.Ct. 1702, 1707–09, 75 L.Ed.2d 736 (1983). It has all the characteristics of the rest of the sidewalk running parallel to Professional Drive. Therefore, the portions of both the street and the sidewalk encompassed within the vacated easement qualify as public fora.

### 2.

In a public forum, a city government may enforce a content-based exclusion if it can show that such regulation is necessary to serve a compelling state interest and that the regulation is narrowly drawn to achieve that end. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983). A city may also enforce content-neutral regulations of the time, place, and manner of expression if the regulations are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *See id.*

### B.

The City says that its action is constitutionally permissible because it is a content-neutral time, place, and manner restriction. The Court disagrees. Vacating the cul-de-sac was not a content-neutral action. The City claims that it vacated the cul-de-sac solely to regulate conduct and control traffic problems. However, the Court need not determine whether this assertion is true because the record clearly shows that the conduct and traffic problems to be regulated are the plaintiffs' protest activities.

Planned Parenthood's attorney stated at a Planning Commission meeting that the request for the vacation was prompted by "the demonstrations against [Planned Parenthood's] functions" and that the vacation "would enhance [police] ability to control the area." At the same meeting, the City Planning Director stated that "the Police Department feels that if there is no public space in front of the building, the demonstrations would either be diminished or eliminated." While the vacation does not have the effect of prohibiting a particular category of speech (it prohibits all speech), it is clearly aimed at demonstrations against Planned Parenthood's functions because the record does not show that any other kinds of demonstrations took place outside the clinic. The City has never attempted to justify its action without reference to the protests against Planned Parenthood's functions; therefore, its action cannot be considered content-neutral. *Boos v. Barry*, 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988).

Because the City's action was not content-neutral, it must show that vacating the cul-de-sac serves a compelling state interest and that its action was narrowly drawn to achieve that purpose. *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. Although keeping protestors from blocking the street, safety concerns, and facilitation of police control of protest activity are all compelling interests, the City cannot show that its action was narrowly drawn. Some evidence of the City's failure to narrowly tailor its action can be found in the fact that the City Council initially approved only a *partial* vacation of the easement, eliminating only pedestrian and parking access. However, even the partial vacation was not narrowly tailored because the record does not show that the City could not have

achieved its aims without completely closing the forum to protestors.

The parties agree that the sidewalk portion of Professional Drive is not very useful to the protestors, making it unclear as to why that portion of the cul-de-sac had to be made private. A total ban on expressive conduct is not warranted when it is clear that the conduct need not be banned in order to maintain order and tranquility. *See Grace*, 461 U.S. at 182, 103 S.Ct. at 1709. In a sense, then, the City's method is the problem. The vacation of an easement that transforms a public street and sidewalk into private property is almost prima facie evidence that the City's action was not narrowly drawn.

There is little in the record to distinguish this case from *Grace*, 461 U.S. at 180, 103 S.Ct. at 1708. There, the Supreme Court said: "Nor may the government transform the character of ... property by the expedient of including it within the statutory definition of what might be considered a nonpublic forum parcel of property." Here, a government entity is attempting to make public property into a "nonpublic forum parcel of property," not through the enactment of a statute, but through the vacation of an easement. Regardless of the method, the effect is the same and equally impermissible.

## C.

■ Finally, even if it can be said that the City's action is content-neutral, it cannot withstand constitutional scrutiny because it is not narrowly tailored to serve a significant government interest. Again, the Court acknowledges the significance of the governmental interests at stake. However, the City's action is not narrowly tailored to achieve those interests. In order to show that a regulation is narrowly tailored, a governmental entity need not show that it adopted the least restrictive or intrusive means of achieving its aims. *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989). Rather, it must show that its interests would be achieved less effectively absent the action taken. *Id.* at 799, 109 S.Ct. at 2758.

■ The narrowly tailored requirement "governs the degree of intrusion the government can impose on behavior that does threaten its interests to some degree. To justify any intrusion at all there must be a threshold showing that the factual situation demonstrates a real need for the government to act to protect its interest." *ACORN v. St. Louis County*, 930 F.2d 591, 595 (8th Cir.1991). The City has not made such a showing because it has not tried to enforce existing regulations—arguably constitutional time, place, and manner restrictions—against the protestors.

The City says that the protestors have no right to stand in the middle of the street in the first place and cites the Michigan statute prohibiting pedestrians from walking on the main traveled portion of a street. Mich.Stat.Ann. § 9.2355 [M.C.L.A. § 257.-655] (Callaghan 1981). The protestors point out that the prohibition only applies where sidewalks are provided and that sidewalks do not run along most of the cul-de-sac. *Id.* While this is true, the statute also states that where there are no sidewalks, pedestrians shall walk along the left side of the street facing traffic. *Id.* Other than for this purpose, it is clear that the protestors have no entitlement to be in the street portion of the cul-de-sac at all, and they certainly have no entitlement to stand in the middle of the street at the end of Professional Drive. Furthermore, the Joint Appendix of State and Local Laws filed by the parties shows that the protestors cannot block traffic, Mich.Stat.Ann. § 9.2376(2) [M.C.L.A. § 257.676b] (Callaghan 1981); harass Planned Parenthood employees, Mich.Stat.Ann. § 28.584 [M.C.L.A. § 750.352] (Callaghan 1990); or loiter, Ann Arbor, Mich., Ordinances ch. 108, § 9.65 (1980). Thus, unless the protestors can engage in their street counseling while walking on the left side of the street, they have no right to engage in such counseling.[5]

---

5. Of course, the protestors could engage in side-

walk counseling *from the sidewalk;* however,

The City says that the police are powerless to enforce these statutes because, whenever they are called, the protestors cease their illegal activities. Despite the fact that it is undisputed that the protestors engage in their expressive activities on specific days and during specific time periods, nothing in the record suggests that the police would be unable to maintain order and safety merely by being present during the time periods when the protestors are active. As a consequence, the Patrol Division Deputy Chief's memorandum and affidavit simply are not enough to warrant a finding that the City's interests would be achieved less effectively if the cul-de-sac were not vacated. At best, his statements are equivocal. First, he says that the police cannot effectively control crowd nuisances and traffic problems. Next, he says that protests tend to last until police can control them. More importantly, the Patrol Division Deputy Chief's statements say very little about what measures the police have attempted to use to control the protests, other than merely responding to complaints from Planned Parenthood. That is, they fail to show that the police have tried to enforce existing laws. While vacating the west end of Professional Drive might be a "valuable law enforcement tool," the City is required to show that it at least opened its toolbox before it can abridge First Amendment rights for the purpose of adding another tool to an already-full box.

In support of its argument that vacating the cul-de-sac is a narrowly tailored place restriction, the City relies on two cases, *Portland Feminist Women's Health Center v. Advocates For Life, Inc.*, 859 F.2d 681 (9th Cir.1988), and *Bering v. SHARE*, 106 Wash.2d 212, 721 P.2d 918 (1986). Both cases are factually distinct from this case because they involved injunctions that were upheld against anti-abortion protestors in actions brought by the clinics involved. Here, Planned Parenthood has remained out of the litigation. More importantly, the injunctions entered in *Portland* and *Bering* did not ban the protestors from an entire area as the City seeks to do in this case. Each injunction confined the protestors to a specific zone, somewhat analogous to confining the protestors to the sidewalk in this case.

A similar result was reached by the Court of Appeals for the Eighth Circuit in *ACORN*. In that case, the appellate court upheld a county ordinance that prohibited solicitors from standing in the street, finding the regulation to be content-neutral and narrowly tailored. *ACORN*, 930 F.2d at 597. Significantly, the parties stipulated that the challenged ordinance did not prohibit the solicitation of drivers as long as the solicitors stood on the curb, median, or shoulder of the road, and not in the street. *Id.* at 594. Such a narrowly drawn ordinance is a far cry from the City of Ann Arbor's attempt to convert public property into private property. Because the City acted in a far less subtle manner, its action cannot stand.

SO ORDERED.

they appear to have little interest in attempting to do so.