Mark FISCHER, Plaintiff,

v.

CITY OF ST. PAUL, Larry McDonald, Brooke Schaub and the Police Department of the City of St. Paul, Defendants.

Civ. No. 4–94–24.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 9, 1995.

Vincent J. Fahnlander, Moss & Barnett, Minneapolis, MN, for plaintiff.

Frank E. Villaume, III, Lisa L. Veith, St. Paul City Atty., St. Paul, MN, for defendants City of St. Paul, Minn., Larry McDonald, Brooke Schaub and Police Dept. of City of St. Paul.

DOTY, District Judge.

Plaintiff brought suit under 42 U.S.C. § 1983 seeking declaratory and injunctive relief on the grounds that defendants violated his First Amendment rights. The parties have submitted cross-motions for summary judgment. Based on a review of the file, record and proceedings herein, and for the reasons stated below, defendants' motion is granted and plaintiff's motion is denied.

## BACKGROUND

Operation Rescue is a major anti-abortion organization known for protests involving physical blockades of clinics providing abortion services. Such blockades, referred to as "rescues," first gained national attention in 1988 when they were used by Operation Rescue in New York City, Washington, D.C. and Atlanta. In the summer of 1991, Operation Rescue planned six days of rallies and protests in Wichita, Kansas. The protest turned into a massive 46–day campaign designed to shut down clinics offering abortion services. Hundreds of protesters defied court orders and formed barricades blocking clinics. A clinic was stormed by protesters who knocked down police barricades. Over 2,600 arrests were made and clinics were forced to close for a week. Operation Rescue's tactics wreaked havoc overwhelming local and state law enforcement and the criminal justice system. Federal marshals had to be called in to restore order.

In early 1992 Operation Rescue declared it would target other cities in a campaign matching the effort launched in Wichita. In April 1992 Operation Rescue leaders staged a blockade campaign in Buffalo, New York to shut down two of five area clinics. Officials anticipated huge protests and hoped to avoid the chaos that occurred in Wichita. The situation was considered more volatile than Wichita as abortion rights supporters mobilized in response to the apparent threat posed by Operation Rescue. Throughout the campaign, abortion rights supporters massed at clinics to confront anti-abortion protesters and physically shield clinics and patients. Court orders were defied as protesters sought to block clinic entrances by trying to break through police barricades and pierce the ranks of abortion rights supporters. Between 500 and 600 anti-abortion protesters were arrested during the 10–day campaign. Many protesters refused to post bail in order to push the Buffalo jail and legal system to capacity.

Operation Rescue staged a one-month campaign to shut down a clinic in Boston in June 1992. Baton Rouge, Louisiana was the next city targeted by the campaign. In anticipation of thousands of demonstrators, a chain-link fence was constructed around the only clinic performing abortions in Baton Rouge. Despite court orders, six clinics in Milwaukee, Wisconsin faced blockade tactics during a six week campaign of anti-abortion protests in the summer of 1992 and more than 1,000 demonstrators were arrested. Abortion rights supporters mobilized to defend the clinics and often outnumbered the anti-abortion protesters. Clashes between the opposing groups caused general disorder and led to occasional violence and large numbers of arrests. Protests continued in Wichita in the summer of 1992. This time, however, law enforcement authorities were able to maintain order by building barricades and fences around clinics, increasing patrols and designating a 25–foot buffer zone between

groups of abortion opponents and abortion rights supporters.

In March 1993, Operation Rescue announced it would come to Minnesota during the summer to conduct a 12–week training session for activists on protest tactics. The students would be taught how to use scriptures to dissuade women from having abortions, how to investigate the background of doctors, how to find names, addresses and phone numbers of patients and clinic staff members and how to use civil disobedience to stop abortions. Operation Rescue also identified the Minneapolis/Saint Paul area as a target of its national "Cities of Refuge" campaign. The campaign was to run for 10 days from July 9 to 18; other target areas included San Jose, California, central Florida, Jackson, Mississippi, Cleveland, Philadelphia and Dallas.[1] Operation Rescue predicted that the crowds would be larger than those that organized in Buffalo in 1992 and Wichita in 1991. On March 11, 1993, an anti-abortion protester shot and killed Dr. David Gunn during a demonstration outside a clinic in Pensacola, Florida. This act of violence, while not linked to Operation Rescue or any other anti-abortion organization, increased safety concerns and intensified tensions between abortion opponents and abortion rights supporters.

In anticipation of the "Cities of Refuge" campaign, the Minnesota State Legislature passed a state clinic access law, Minn.Stat. § 609.7495. The statute, effective May 20, 1993, makes it a misdemeanor to "intentionally and physically obstruct [ ] any individual's access to or egress from a facility." The statute provides that it shall not be "construed to impair the right of any individual or group to engage in speech protected by the United States Constitution, the Minnesota Constitution, or federal or state law, including but not limited to peaceful and lawful handbilling and picketing." Minn.Stat. § 609.7495, subd. 3. The law was designed "to provide police officers a tool to better control obstructing crowds, such as seen with Operation Rescue at Planned Parenthood

clinics, or individuals at battered womens' shelters, etc." Operation Rescue's leaders indicated that they would not honor the law which they considered unconstitutional.

Operation Rescue did not disclose which facilities would be targeted during its campaign in the Twin Cities. Two clinics in the St. Paul area offer abortion services; St. Paul Ramsey Hospital in downtown St. Paul and Planned Parenthood in southwest St. Paul. Planned Parenthood has been the site of abortion protests for years. Local anti-abortion groups usually informed the St. Paul police in advance of their protest activities at the clinic. The protests were generally peaceful and kept orderly by the presence of police officers. In 1991 children affiliated with Pro–Life Action Ministries temporarily closed the clinic by locking themselves together and to the doors of the clinic with bicycle locks. The Ramsey County District Court permanently enjoined Pro–Life Action Ministries, and others acting in concert with them, from entering the private property of Planned Parenthood, from blocking the driveway or entrances to the clinic and from impeding the unfettered travel of persons entering and leaving the clinic. Pro–Life Action Ministries complied with the injunction and few problems occurred between 1991 and 1993.

St. Paul police considered Planned Parenthood a likely target of Operation Rescue's campaign. Commander Larry McDonald, the team leader of southwest St. Paul, was responsible for preparing for the anticipated massive and potentially unruly protests. McDonald visited past target cities to gather facts from police departments experienced in dealing with large anti-abortion protests sponsored by Operation Rescue. McDonald selected Wichita, Baton Rouge, Milwaukee and Fargo. McDonald gained information about the number of protesters and the tactics they used, various police responses and problems encountered by law enforcement authorities. He also learned what alternatives had been tried and what worked and did not work. McDonald was concerned

---

1. These cities were chosen by Operation Rescue so that every citizen would be within a 24–hour drive of one.

about the potential for violence in front of Planned Parenthood and hoped to avoid dangerous confrontations between groups of abortion opponents and abortion rights supporters.

McDonald decided that building a barrier around Planned Parenthood and placing a buffer zone between opposing groups was necessary to maintain peace and order. Planned Parenthood is located at 1965 Ford Parkway on a busy traffic route that spans the Mississippi River and links St. Paul and Minneapolis. The driveway and parking lot of the clinic also abut Ford Parkway. Planned Parenthood is bordered by two private businesses—a car wash on the west and a Burger King restaurant on the east. The entrance to Planned Parenthood is only twelve and one-half feet from the public sidewalk which ranges from seven to thirteen feet in width.

McDonald concluded that the sidewalk directly in front of the Planned Parenthood could not be safely controlled without a fence. In deciding to erect a fence, McDonald considered several factors, including ensuring access to the clinic during protests, observing the First Amendment rights of demonstrators, the large number of protesters anticipated and their likely protest tactics, avoiding disruption to the surrounding business and residential community, the busy traffic route in front of the clinic and the small area to control large groups of people. McDonald also had to accommodate three groups with differing views—abortion opponents, abortion rights supporters and a group called the anarchists which attempts to interfere with and defeat anti-abortion protests.

McDonald consulted city officials about his findings and decision to erect a fence around Planned Parenthood. McDonald met with the mayor and his top decision makers, the chief and deputy chief of police and members of the St. Paul City Attorney's office. McDonald summarized the information he learned about Operation Rescue's siege tactics in other cities. McDonald said a fence and buffer zone were necessary for crowd control and to provide access to the clinic. Concern was expressed over obstructing access to the public sidewalk. McDonald explained that gates would be used to allow entrance to the clinic and that the parking lane and a lane of traffic on Ford Parkway would be blocked off and designated as an alternative area for anti-abortion protesters.

An eight-foot chain-link fence was placed along Ford Parkway between the curb and the sidewalk to provide a temporary buffer zone. The fence enclosed Planned Parenthood, the parking lot and the public sidewalk in front of the clinic. The fence ran approximately 100 feet along the sidewalk with an opening for the clinic driveway. On the west side, the fence ran from Ford Parkway, along a parking lot for the car wash, to the dead-end alley behind the clinic. The fence extended across the back of the property along the alley. On the east side, the fence ran from the alley to the clinic building and from the curb to the building. A sign on the fence stated it was "Unlawful to Block Access" pursuant to Minn.Stat. § 609.7495.

Gates were located on the east end of the sidewalk and where the sidewalk intersected with the driveway. The gates were open and the public was permitted free access except during the 10-day Operation Rescue campaign. During that time all persons were prohibited from the sidewalk in front of the clinic except invitees of Planned Parenthood were allowed to walk across the sidewalk to gain access to the property. The police blocked off westbound traffic on one lane of Ford Parkway so anti-abortion protesters could gather outside the fence. Abortion opponents were also allowed to protest from the public sidewalk adjacent to Planned Parenthood in front of Burger King. Due to traffic and safety concerns, St. Paul police allowed only one anti-abortion protester to stand at the entrance of the driveway to hand out literature. The sidewalk on the opposite side of Ford Parkway was designated for abortion rights supporters. Police were present at Planned Parenthood 24 hours a day during Operation Rescue's campaign.

In anticipation of Operation Rescue's campaign, five Twin Cities organizations, including Planned Parenthood, formed a coalition called the Network to Ensure Access. The

coalition trained hundreds of abortion rights supporters how to shield clinics and patients during a massive blockade. The coalition apprised police of their activities and invited police officers to attend a training session for an overview of their planned response to Operation Rescue's campaign. The trainees were referred to as "clinic defenders." Clinic defenders were assigned to clinics where large anti-abortion demonstrations were expected. Clinic defenders planned to arrive at clinics before abortion opponents to ensure access and provide support for patients and staff. Clinic defenders were present at the request of the clinics and were invitees on their property.

Mark Fischer is an individual strongly opposed to abortion. In May 1993, Fischer began protesting twice weekly in front of Planned Parenthood. He engaged in picketing, distributing literature and sidewalk counseling on the public sidewalk in front of the clinic. St. Paul police were familiar with Fischer and his protest activities and regarded him as peaceful and non-violent. Fischer is not affiliated with Operation Rescue. Twice during the Operation Rescue campaign St. Paul police prevented Fischer from entering onto the public sidewalk in front of Planned Parenthood and restricted him and other abortion opponents to nearby areas which had been blocked off for protesters.

On July 12, 1993, Fischer arrived at Planned Parenthood at 8:30 a.m. to picket, distribute literature and offer sidewalk counseling. Fischer entered the public sidewalk in front of the clinic but was removed by St. Paul police officers under threat of arrest. Sergeant Brooke Schaub told Fischer the sidewalk was closed to the public temporarily due to the tactics of Operation Rescue. McDonald gave Fischer a similar explanation. Fischer informed the police he did not belong to Operation Rescue but he was still excluded from the fenced area because he was not an invitee of Planned Parenthood.

Fischer was directed to the sidewalk at the east end of the fence and an area on Ford Parkway outside of the fence that was blocked off for anti-abortion protesters. Fischer returned to protest on the morning of July 14, 1993, and was again excluded from the public sidewalk in front of the clinic. Fischer complains that he was unable to distribute any literature or counsel any clinic patients. However, Fischer was not prevented from expressing his views in any manner outside of the buffer zone. Fischer stood in the public street in front of Planned Parenthood holding a sign, speaking to abortion rights supporters and singing.

Persons allowed to enter the fenced area included patients, staff members, clinic defenders, a mail carrier, delivery people, the fire department and utility people. Local news reporters also entered the fenced area although it is not clear whether they were invitees of Planned Parenthood. Clinic defenders wearing red shirts were allowed to enter the fenced area and walk across the sidewalk to gain access to the clinic property. It is undisputed that the clinic defenders were invitees of Planned Parenthood. Clinic defenders carried identification cards and wore red shirts with "Keep Minnesota Nice" on the front and "Stop Operation Rescue" or "This Clinic Stays Open" on the back. A small group of clinic defenders remained outside the clinic and held signs saying "Planned Parenthood is Open" and "This Clinic Stays Open."

Police had expressed concern about large groups of defenders gathering at clinics and Planned Parenthood agreed to limit the number of defenders present on its property. Police told the clinic defenders to remain on the clinic's property and stay off the sidewalk except to access and exit the property. The defenders generally cooperated but minor infractions occurred.[2] Any clinic defender seen standing on the public sidewalk was told to move by St. Paul police. Fischer claims

2. The court has viewed the videotapes submitted by plaintiff. The tapes show clinic employees, patients and invitees using the public sidewalk to access and exit the clinic property. A few curious clinic employees came outside to observe the demonstration and strayed onto the public sidewalk momentarily. Other employees and clinic defenders sat on adjoining brick walls with their feet hanging over or resting on the public sidewalk. No flagrant violations were captured on the videotape. Instead the footage shows the restriction was uniformly applied and generally followed.

he saw defenders standing on the public sidewalk or resting a foot on the sidewalk. Fischer once observed some clinic defenders huddle together on the sidewalk for a minute or so. The group was talking loudly and clapping and at least one defender said "Operation Rescue more like Operation Retreat." According to Fischer, when the group dispersed some clinic defenders remained on the public sidewalk and others returned to the private property.

Operation Rescue held daily protests but the huge rallies anticipated by state and local officials never fully materialized. During the 10–day campaign 3,400 people attended church rallies or sidewalk pickets. The church rallies drew large crowds but large numbers of abortion opponents failed to appear at the clinics. The protests remained orderly and nonviolent; no massive blockades or major incidents occurred at Planned Parenthood or any other clinic in the Twin Cities. The most disorder occurred when groups of abortion rights supporters tried to disrupt rallies and meetings sponsored by Operation Rescue at local churches. Fourteen abortion rights supporters were arrested during the campaign.

Fischer brought suit under 42 U.S.C. § 1983 on the grounds that defendants violated his First Amendment rights by denying him access to the public sidewalk based on his pro-life views. Fischer asserts that Minn.Stat. § 670.7495 as interpreted and enforced by the City of St. Paul violated his constitutional right to free speech.[3] Fischer seeks declaratory and injunctive relief but has withdrawn his claim for damages. Defendants respond that a valid time, place and manner restriction was imposed and, therefore, that Fischer was not deprived of his First Amendment rights.

## DISCUSSION

■ On a motion for summary judgment, the evidence is viewed in favor of the nonmoving party and that party benefits from all justifiable inferences that can be drawn in its favor. *Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The nonmoving party cannot rest upon mere denials or allegations but must set forth specific facts, by affidavit or otherwise, sufficient to raise a material issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### 1. First Amendment

■ Fischer contends that fencing off the public sidewalk in front of the Planned Parenthood clinic constituted an impermissible prior restraint on his freedom of speech. Fischer claims that defendants acted to prohibit his speech based on its content before it even occurred. The court disagrees with the prior restraint analysis advanced by plaintiff. A prior restraint is generally any governmental action that would prevent a communication from reaching the public. Fischer was not prevented from expressing his message in any one of several different ways; he was simply prohibited from expressing it within the buffer zone. *See, e.g., Madsen v. Women's Health Center,* —— U.S. ——, —— n. 2, 114 S.Ct. 2516, 2524 n. 2, 129 L.Ed.2d 593 (1994).

■ There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving "speech" protected by the First Amendment. It is also true that streets and sidewalks are traditional public fora, places that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions." *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). The First Amendment does not, however, guarantee an absolute right to anyone to express their views any

---

**3.** Fischer challenges the statute as applied; he does not assert a facial challenge to the validity of the statute.

place, any time, and in any way that they want. *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981). Even protected speech in public places may be subject to content-neutral time, place and manner restrictions if they are narrowly tailored to serve significant government interests and preserve ample alternative channels of communication. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

Fischer argues the restrictions placed on the public sidewalk in front of the clinic are content-based and therefore are subject to strict scrutiny. In a public forum, a content-based restriction may be enforced only if the government can show the restriction is necessary to serve a compelling state interest and the restriction is narrowly drawn to achieve that end. *Id.* The key inquiry in determining content neutrality is whether the government adopted a regulation of speech without reference to the content of the speech. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). Thus the government's purpose is the threshold consideration. A regulation that serves purposes unrelated to the content of speech is deemed neutral even if it has an incidental effect on some speakers or messages but not others. *Id.* at 791, 109 S.Ct. at 2753 (citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986)).

The fence was installed in response to the threat posed by Operation Rescue's documented lawless activities. The principal justification for installing the fence and banning public access to the sidewalk was the city's desire to maintain public safety and order and avoid dangerous confrontations between opposing groups. Another justification offered by the city is its interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy and allowing the clinic to operate while at the same time accommodating the right of abortion opponents to pro-

test. These justifications have nothing to do with content of plaintiff's speech and do not suggest a hidden purpose to regulate speech because of a disagreement with plaintiff's message. The court is satisfied that the restriction on speech at issue here is content neutral.

Relying on *Thomason v. Jernigan,* 770 F.Supp. 1195, 1201 (E.D.Mich.1991), Fischer argues that fencing off the sidewalk in anticipation of Operation Rescue's protests constitutes content-based discrimination as it was done with "reference" to anti-abortion speech activities. In *Thomason,* the City of Ann Arbor, Michigan, passed a resolution banning the public from a cul-de-sac providing access to a Planned Parenthood clinic. The cul-de-sac had been the site of anti-abortion protests for several years. The city argued the resolution was a content-neutral measure designed to regulate traffic and crowd control problems. *Id.* at 1201. Although the resolution banned all public access to the cul-de-sac, the *Thomason* court found it was content-based because it was aimed at anti-abortion protests against Planned Parenthood. *Id.*

The court declines to follow the analysis applied in *Thomason.* It is well-established that a restriction on speech is considered content neutral if it is justified without reference to the content of the expression. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753. The justifications given for the resolution in *Thomason* were traffic and crowd control problems. The resolution served purposes unrelated to the content of the speaker's message and did not distinguish between permitted and prohibited speech on the basis of content. The resolution in that case is not rendered content-based simply because it had an incidental effect on only some speakers or messages. *Id.* See *Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (ordinance banning picketing directed at a single residence was content neutral though it was enacted in response to complaints concerning the picketing activities of abortion opponents outside a doctor's residence).[4]

---

**4.** The court does agree with the holding in *Tho-*     *mason* that in any event the resolution was not

Fischer also claims the city of St. Paul installed the fence because it endorsed the message of abortion rights supporters and disagreed with the content of Fischer's speech. In Fischer's view, abortion rights supporters were given preferential treatment by having access to the public sidewalk while he and other abortion opponents were denied such access. The evidence, however, does not support Fischer's contention. Except for invitees of Planned Parenthood and persons with legitimate business to conduct at the clinic, the sidewalk directly in front of Planned Parenthood was closed to the entire public.[5] While clinic defenders were allowed to use the sidewalk to gain access to and from the clinic property, other abortion rights supporters were confined to the sidewalk across the street from Planned Parenthood and were not allowed on the public sidewalk. The court also notes that the injunction upheld in *Madsen* was deemed content-neutral even though abortion rights supporters, who were invitees of the clinic, were permitted to enter the public right of way within the buffer zone.

There is evidence of minor encroachments committed by clinic defenders and staff and one instance where some clinic defenders huddled on the public sidewalk for a few moments. However, it is undisputed that the St. Paul police told clinic defenders to remain on the clinic's property and stay off the sidewalk except for purposes of ingress and egress. Any clinic defender seen standing on the public sidewalk was told to move by police. There is no evidence which suggests the St. Paul police observed clinic defenders on the sidewalk and allowed them to remain there. Rather, the evidence demonstrates that the police applied the ban evenhandedly. While occasional infractions occurred, the evidence fails to show that the restriction was applied differently based on the content of speech.

Fischer asserts there was no need to restrict public access to the sidewalk

given the history of peaceful protest activity by local organizations at Planned Parenthood. "To justify any intrusion at all [on speech] there must be a threshold showing that the factual situation demonstrates a real need for the government to act to protect its interest." *ACORN v. St. Louis County,* 930 F.2d 591, 595 (8th Cir.1991). Fischer's argument ignores the fact that defendants knew the situation was not limited to local protesters who had been accommodated for years. St. Paul was a target city of Operation Rescue's national campaign. In other campaigns Operation Rescue recruited hundreds of local abortion opponents and attempted to shut down clinics with massive physical blockades. Communities caught unprepared were overwhelmed. Abortion opponents defied court orders by physically blocking clinic entrances despite barricades and the presence of large numbers of police officers. People were injured, property was damaged and havoc reigned. In cities where abortion rights supporters had mobilized in response to Operation Rescue's campaign violence erupted in clashes between the opposing groups.

It was reasonable for the City of St. Paul to anticipate a campaign similar to those waged by Operation Rescue in other target cities. Operation Rescue had predicted larger crowds than those that organized in Buffalo in 1992 and Wichita in 1991. The dangers such a campaign posed to access to Planned Parenthood and public safety were real, not speculative. The First Amendment does not require the St. Paul police to ignore valid public safety concerns and allow mayhem to ensue before acting to protect access to the clinic and ensure public safety. *Accord ACORN,* 930 F.2d at 596. It cannot be doubted that the government has a strong interest in ensuring public safety and order. The government also has a strong interest in protecting a woman's access to seek lawful medical or counseling services in connection with her pregnancy. *Madsen,* —— U.S. at ——, 114 S.Ct. at 2526. The city's interests in protecting the property rights of all citi-

narrowly tailored to achieve the significant government interests at stake. 770 F.Supp. at 1202.

**5.** For example, a videotape submitted by Fischer shows several members of the public being di-

verted from the sidewalk in front of the clinic to an alternative sidewalk blocked off on Ford Parkway.

zens and in promoting the free flow of traffic on public streets are also substantial.

Having determined that significant governmental interests were indeed at stake, the court considers whether the restriction is narrowly tailored to serve those interests and leaves open ample alternative channels of communication. *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753. The validity of time, place, or manner restrictions does not turn on the court's "agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted. *U.S. v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985). Rather, the requirement of narrow tailoring is satisfied so long as the restriction promotes a substantial government interest that would be achieved less effectively absent the restriction and the means chosen are not substantially broader than necessary to achieve that interest. *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. The record before the court demonstrates that the restrictions imposed helped ensure public safety and order and protected access to the clinic.

Fischer complains that the St. Paul police failed to adopt the least intrusive means of protecting its legitimate interests. In Fischer's view, there were several alternative methods of achieving the desired end that would have been less restrictive of his First Amendment rights. However, a "less-restrictive-alternative-analysis" has never been the test for the validity of a time, place, or manner regulation. In *Ward* the Supreme Court clarified the standard to be applied:

> [A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but ... it need not be the least restrictive or least intrusive means of doing so.

> \*   \*   \*   \*   \*   \*

So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. 491 U.S. at 798 & 800, 109 S.Ct. at 2757 & 2758 (footnote and internal quotations omitted). *See Albertini,* 472 U.S. at 689, 105 S.Ct. at 2906 (restrictions on the time, place, or manner of protected speech are not invalid "simply because there is some imaginable alternative that might be less burdensome on speech.").

Fischer also contends that a buffer zone cannot be upheld unless there is evidence that anti-abortion protestors have obstructed access to Planned Parenthood, blocked vehicular traffic or otherwise unlawfully interfered with the clinic's operations. This argument again focuses only on the activities of local anti-abortion organizations and ignores the presence of Operation Rescue, a national organization with a long record of blocking and interfering with free access to clinics offering abortion services. Less restrictive security measures had failed to preserve access to clinics and protect public safety and maintain order during past Operation Rescue campaigns. In other target cities court orders, barricades and the presence of large numbers of police officers were not successful. It was reasonable for the St. Paul police to consider the failure of these measures when deciding how to protect the significant government interests at stake. The First Amendment does not require the St. Paul police to implement means which had already proven ineffective to contain the threat posed by Operation Rescue's campaign.

The significant governmental interests which were furthered by the temporary buffer zone—protecting access to the clinic and ensuring public safety—would have been less well served in the absence of the restriction. The buffer zone enclosing the sidewalk in front of the clinic entrance and surrounding the parking lot was a means of protecting unfettered access to and from the clinic. The St. Paul police seem to have had few other options to protect access given the narrow confines around the clinic entrance. *Madsen,* —— U.S. at ——, 114 S.Ct. at 2527. The buffer zone was very close to the clinic entrance and directly abutted the clinic prop-

erty. The police were convinced that allowing abortion opponents to stay on the sidewalk was not a viable option in view of the siege tactics used in past Operation Rescue campaigns. The fence and buffer zone also protected the public safety and reduced the likelihood for violence by separating the opposing groups within the small space available.[6]

The court must also consider the extent to which the restriction may have the incidental effect of burdening behavior that does not threaten the governmental interest in question. A restriction cannot "burden *substantially* more speech than is necessary to further the government's legitimate interests." *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758 (emphasis added). The buffer zone was adopted as a practical device used by the police to protect those actively exercising their rights from those who would prevent its exercise. While the restriction did have the incidental effect of preventing speech in the buffer zone, the court concludes that, on balance, the restrictions imposed burdened no more speech than necessary to accomplish the important governmental interests.

The court also holds the final requirement, that the restriction leave open ample alternative channels of communication, is easily met. Fischer was allowed to engage in a full range of expressive activity outside of the buffer zone. St. Paul police made special accommodations to permit Fischer and other abortion opponents to express their views in an area near the clinic entrance. The police designated and blocked off the parking lane and a lane of traffic on Ford Parkway, a public street, as an area for anti-abortion protesters. The buffer zone was narrow enough to place Fischer and other abortion opponents within a few feet from persons approaching the clinic entrance. Anti-abortion protesters were allowed to gather in the street directly in front of Planned Parenthood and could be heard and seen from the clinic property.

**CONCLUSION**

The focus of this controversy is the public sidewalk in front of Planned Parenthood in southwest St. Paul. During Operation Rescue's 10–day campaign the City of St. Paul banned the public from the sidewalk except invitees of Planned Parenthood who were allowed to use it to gain access to and from the clinic property. Plaintiff contends the restriction violated his First Amendment rights. The court concludes that the restriction was narrowly tailored to serve the substantial and content-neutral governmental interests of ensuring public safety and order and protecting a woman's access to lawful medical or counseling services in connection with her pregnancy. The restriction also preserved ample alternative channels of communication. Thus, plaintiff has failed to demonstrate that defendants violated his First Amendment rights.

Based on the foregoing, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

---

6. *See Madsen,* —— U.S. at ——, 114 S.Ct. at 2527 (36–foot buffer zone upheld given the focus of picketing on patients and clinic staff, the narrowness of the confines around clinic and the fact that protesters could still be seen and heard from clinic parking lots).